FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAMUEL R. WATKINS,
                    *Plaintiff-Appellant,*

v.

UNITED STATES BUREAU OF CUSTOMS
AND BORDER PROTECTION,
                    *Defendant-Appellees.*

No. 09-35996

D.C. No.
2:08-CV-01679-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
July 13, 2010—Seattle, Washington

Filed May 6, 2011

Before: Pamela Ann Rymer and N. Randy Smith,
Circuit Judges, and Donald E. Walter, District Judge.*

Opinion by Judge Walter;
Partial Concurrence and Partial Dissent by Judge Rymer;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

*The Honorable Donald E. Walter, Senior United States District Judge
for the Western District of Louisiana, sitting by designation.

## COUNSEL

Samuel R. Watkins, Fall City, Washington, proceeding *pro se* as plaintiff-appellee.

Kayla C. Stahman, Assistant United States Attorney, Western District of Washington, for defendant-appellee United States Bureau of Customs and Border Protection.

## OPINION

WALTER, District Judge:

Appellant, Samuel Watkins ("Watkins"), a copyright and trademark attorney, appeals pro se the district court's sum-

mary judgment in favor of the United States Bureau of Customs and Border Protection ("CBP") in his eight Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests for 19 C.F.R. § 133.21(c) Notices of Seizure of Infringing Merchandise ("Notices of Seizure" or "Notices") from the Ports of San Francisco, Miami, El Paso, Seattle, Newark/New York, Los Angeles/Long Beach, and Boston. Watkins's FOIA request to the Port of Seattle sought "[a]ll notices to trademark owners required to be made pursuant to 19 C.F.R. Section 133.21(c), dated during the period January 1, 2005 through July 31, 2007, regarding merchandise seized at the Port of Seattle as being counterfeit, as defined in 19 C.F.R. Section 133.21(a)." Watkins made almost identical requests to the remaining six ports identified above.

According to Watkins, he did not receive any response or acknowledgment of the FOIA requests he sent to the Ports of San Francisco and Miami, as well as a second request to the Port of Seattle. He further contends that the Port of El Paso only informed him that his request had been sent to the FOIA division in Washington D.C., without providing any further information on the status of the request. The Ports of Newark/New York, Los Angeles/Long Beach, and Boston demanded, as a prerequisite to responding to Watkins's request, that he make an advance payment to cover the processing fees for his FOIA request. The Ports required advance processing fees ranged from $500 to almost $30,000. In order to avoid paying what he deemed to be exorbitant processing fees for his various FOIA requests, Watkins limited the breadth of his FOIA requests to cover a shorter time-period.

Commercial importers provide the information revealed in the Notices of Seizure to the Agency when they "make entry" into the United States. "Making entry" consists of providing information to the Agency, including the port of entry, description of the merchandise, the quantity of merchandise, and the name and address of both the exporter and the importer. The Agency largely maintains the confidentiality of

this information because it is important that it receive accurate information from importers. The Agency gives this information in the Notices of Seizure *only* to notify trademark owners upon the seizure of goods bearing a counterfeit mark "that infringe upon their trademark that has been recorded with [the Agency]."

The Notices of Seizure include the following information: (1) the date the merchandise was imported; (2) the port of entry; (3) description of the merchandise; (4) quantity of the merchandise; (5) country of origin of the merchandise; (6) name and address of the exporter; (7) name and address of the importer; and (8) the name and address of the manufacturer. The eighth item of information is not always known to the Agency and is therefore sometimes excluded from the Notice of Seizure. In addition to the above information, the Notices of Seizure also include the name of the individual responsible for receiving the Notices on behalf of the trademark holder.

After considerable back and forth between Watkins and the Ports, the Ports provided Watkins heavily redacted Notices of Seizure sent during the relevant time periods, citing FOIA exemptions 5 U.S.C. § 552(b)(2), (b)(4), (b)(6), and (b)(7)(A) and (C).

The district court first addressed Watkins's claim that the Agency improperly relied on the DHS's FOIA fee regulations instead of its own in order to increase Watkins's costs. According to the court, upon becoming a component of DHS, CBP needed DHS's approval to maintain its previously-promulgated FOIA regulations. Because CBP did not seek DHS's approval, DHS's FOIA regulations properly governed Watkins's requests. The district court discounted the amendments CBP made to its FOIA fee regulations after becoming a component as merely technical amendments, which were not enough "evidence that the Agency reviewed its FOIA fee schedule and affirmatively determined that they would remain in the regulations."

The district court next addressed the Agency's redaction of the Notices of Seizure pursuant to 5 U.S.C. § 552(b)(4), or Exemption 4. First, the court found "that information redacted in the Notices does constitute 'confidential' information." The court was persuaded that Notices of Seizure do not always pertain to counterfeit goods, and it noted that the issuance of a Notice does not by itself demonstrate the importer was (1) liable for trademark infringement and (2) aware of the counterfeit nature of the goods. As a result, importers of goods seized are not "unworthy of protection from competitive harm." Second, the court noted that although an agency ordinarily provides "affidavits from the submitters of the information objecting to disclosure, . . . the Ninth Circuit has carved out exceptions in cases where the Agency submits a declaration from a declarant that is 'very familiar' with the industry at issue." The court concluded that this exception was met because the Agency's declarants had "extensive knowledge of commercial enforcement and intellectual property affecting the nation's borders." Third, the court found that the Agency's release of the Notices to affected trademark holders did not waive Exemption 4. The Agency was statutorily obligated to provide such "limited disclosure[s] to interested third-parties." Fourth, the court found that the Agency "c[ame] forth with more than adequate information detailing the various harms that could befall importers if the Notices of Seizure were disclosed." Consequently, the court granted the Agency's Motion for Summary Judgment and its request for a Protective Order.

## STANDARD OF REVIEW

As we recently held in *Electronic Frontier Foundation v. Office of the Director of National Intelligence*, ___ F.3d ___, 2010 WL 1407955 (9th Cir. Apr. 9, 2010), FOIA was enacted to create a "judicially enforceable public right to secure" government documents. *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526

(1991) (FOIA "was enacted to facilitate public access to Government documents."). The statutory scheme provides public access to government information "shielded unnecessarily" from the public and establishes a "judicially enforceable public right to secure such information from possibly unwilling official hands." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (internal quotation marks omitted). FOIA's purpose was thus to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) (internal quotation marks omitted).

"At the same time, FOIA contemplates that some information may legitimately be kept from the public." *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). The statute contains nine exemptions, pursuant to which the government can withhold information otherwise available for disclosure. See 5 U.S.C. § 552(b)(1)-(9) (2006). "FOIA's 'strong presumption in favor of disclosure' means that an agency that invokes one of the statutory exemptions to justify the withholding of any requested documents or portions of documents bears the burden of demonstrating that the exemption properly applies to the documents." *Lahr*, 569 F.3d at 973 (quoting Ray, 502 U.S. at 173). Because of its overarching goal of public disclosure, FOIA "exemptions are to be interpreted narrowly." *Id.*

On summary judgment, we employ a two-step standard of review in FOIA cases. *Lion Raisins Inc. v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1078 (9th Cir. 2004). First, whether, de novo, "an adequate factual basis exists to support the district court's decisions." *Milner v. U.S. Dep't of the Navy*, 575 F.3d 959, 963 (9th Cir. 2009). If so, " 'then we review the district court's conclusions of fact for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed de novo.' " *Id.* (*quoting Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008)). The burden

rests on the government to justify its decision to exclude disclosures under FOIA. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

## A.  FOIA Exemption Four

**[1]** The trade secret exemption to FOIA states, "[t]his section does not apply to matters that are (4) trade secrets and commercial or financial information obtained from a person and privileged and confidential." 5 U.S.C. § 552(b). In order to invoke Exemption 4 in the Ninth Circuit, the government agency must demonstrate that the information it sought to protect is "(1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential." *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994).

The terms "commercial or financial" are given their ordinary meanings. *See Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

"To summarize, commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *G.C. Micro Corp.*, 33 F.3d at 1112 (adopting the standard from *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)). The only issue before this court is the second prong "substantial harm."

**[2]** Information is "confidential" for the purposes of the "trade secrets" exemption where disclosure of that information could cause "substantial harm to the competitive position of the person from whom the information was obtained." *G.C.*

*Micro Corp.*, 33 F.3d at 1112-13 (9th Cir. 1994) (*citing Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C.Cir. 1974)). The government need not show that releasing the documents would cause "actual competitive harm." *Id.* at 1113. Rather, the government need only show that there is (1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released. *Id.*

"This Court must first determine whether the district court had an adequate factual basis for its decision. Courts can rely solely on government affidavits so long as the affiants are knowledgeable about the information sought and the affidavits are detailed enough to allow the court to make an independent assessment of the government's claim." *Lions Raisins v. U.S. Dept. Of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (citing *Church of Scientology v. United States Dept of the Army*, 611 F.2d 738, 742 (9th Cir. 1979)) ("If the agency supplies a reasonably detailed affidavit describing the document and facts sufficient to establish an exemption, then the district court need look no further in determining whether an exemption applies."). *See Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1227 (9th Cir. 1991) (holding that affidavits that described documents withheld, the statutory exemptions claimed, and the specific reasons for the agency's withholding provided adequate factual basis for application of "trade secrets" exemption). *Lions Raisins*, 354 F.3d at 1080.

If the district court had adequate factual basis for its decision then this court must decide whether the district court clearly erred in determining that the Notices of Seizure fell within the "trade secrets" exemption to FOIA.

Competitive harm analysis "is . . . limited to harm flowing from the affirmative use of proprietary information by *competitors*. Competitive harm should not be taken to mean simply any injury to competitive position . . . ." *Pub. Citizen Health Research Group*, 704 F.2d at 1291-92 & n. 30 (quota-

tion omitted; emphasis in original). Although "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] . . . [c]onclusory and generalized allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* at 1291 (internal citation omitted).

### 1.

**[3]** Watkins argues that the information contained in Notices of Seizure cannot be commercial because it pertains to "the unlawful importation of counterfeit goods, and not any sort of legitimate commercial activity." The district correctly rejected this argument because Notices of Seizure are not final determinations that goods seized are counterfeit. Instead, the issuance of a Notice is akin to a finding of probable cause. *See generally United States v. 10,510 Packaged Computer Towers*, 152 F. Supp. 2d 1189 (N.D. Cal. 2001) (concluding the government properly seized and forfeited merchandise under 19 U.S.C. § 1526(e) because it had probable cause to believe the merchandise was counterfeit). As the Agency's declarations demonstrate, an importer whose merchandise is seized can challenge the seizure both administratively and in court. Further, importers sometimes acquiesce in the Agency's seizure and forfeiture of *legitimate* goods. As a result, we cannot conclude that information contained in a Notice of Seizure is non-commercial just because it's likely — perhaps even very likely — that the merchandise seized is counterfeit.

**[4]** In short, the district court's finding that the Notices contain plainly commercial information, which discloses intimate aspects of an importers business such as supply chains and fluctuations of demand for merchandise, is well supported.

### 2.

**[5]** The major area of dispute is whether or not the information contained in the Notices of Seizure is privileged or

confidential. Since the government conceded that importers are mandated to provide the information to them (AR 93), the only issue before the court is whether the disclosure would cause substantial harm to the competitive position of the providers of the information.

To satisfy the harm element, the government needs to show there is actual competition in the relevant market and a likelihood of substantial injury.

We must ensure the district court had an adequate factual basis for its ruling. As *Lion Raisins* demonstrates, a district court can satisfy this burden with only affidavits from knowledgeable Agency personnel. In this instance, the Agency provided two affidavits from knowledgeable agency employees, as well as declarations from major trade organizations representing a range of legitimate importers.

**[6]** Despite Watkins's arguments that the Agency did not specify a relevant market, *Watkins* specified the relevant market by requesting *all* Notices of Seizure. Therefore, Watkins established the relevant market as the entire market for imported goods. There is no set test for determining actual competition in a relevant market. We embrace a common sense approach to this issue. The United States import market exceeds $1 trillion annually. *See U.S. Census Bureau U.S. Bureau of Economic Analysis* <http://www.census.gov/foreigntrade/Press-Release/2009pr/final_revisions/09final.pdf> (last visited July 20, 2010). This leaves little doubt that there is actual competition. Recognizing "the law does not require the [Agency] to engage in a sophisticated economic analysis of the substantial competitive harm to [the importers] that might result," *GC Micro Corp.*, 33 F.3d at 1115, the Agency's affidavits provide a sufficient factual basis for the district court to conclude that the disclosure of the information in the Notices of Seizure poses a substantial likelihood of competitive injury to importers of non-counterfeit goods who zealously guard their supply chains. Combine this information

with already public information and importers' entire distribution network and demand trends could be revealed. *See Gilda Indus., Inc. v. U.S. Customs & Border Prot. Bureau*, 457 F. Supp. 2d. 6, 10-11 (D.D.C. 2006). The district court was not clearly erroneous in its finding that the information was confidential and privileged. Exemption 4 applies to Notices of Seizure.

### 3.

**[7]** Although Exemption 4 applies to Notices of Seizure, shielding them from public disclosure, CBP waived the confidentiality of the Notices by disclosing them to trademark owners without any limits on further dissemination. The government "waives" protection under Exemption 4 when it releases purportedly confidential information to the public. *See Herrick v. Garvey*, 298 F.3d 1184, 1193 (10th Cir. 2002) ("[W]hether 'information is already in the public domain,' i.e., waiver of an exemption, is a 'proposition that if true would give victory [to plaintiff] independent' of whether Exemption 4 properly applies." (quoting *Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) ("To the extent that any data requested under FOIA are in the public domain, the [government] is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4." (alteration added)). Indeed, the "purpose of Exemption 4 is 'to protect the confidentiality of information which is obtained by the Government . . . but which would customarily not be released to the public by the person from whom it was obtained.' " *Herrick* , 298 F.3d at 1193 (citation omitted).

**[8]** Here, disclosure of the Notices of Seizure to an aggrieved trademark owner is mandated by statute. 19 U.S.C. § 1526(e). When disclosure is made to a trademark owner, the government imposes no restrictions on the owner's use of the information in the Notice. He can freely disseminate the

Notice to his attorneys, business affiliates, trade organizations, the importer's competitors, or the media in a way that would compromise the purportedly sensitive information about an offending importer's trade operations. This no-strings-attached disclosure thus voids any claim to confidentiality and constitutes a waiver of Exemption 4. FOIA accordingly creates an obligation for the government to disclose the requested documents.

While the "public domain" test articulated by the D.C. Circuit is one persuasive way of determining when the government has waived confidentiality under FOIA, *see, e.g., Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (requiring information to be "preserved in a permanent public record" to effectuate waiver), it should not be the *only* test for government waiver.

Most cases applying the public domain test have grappled with requests for sensitive information involving high-level criminal investigations or matters of national security. *See id.* at 35-36 (seeking disclosure of classified CIA documents and aerial photographs); *Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) (seeking FBI wiretap recordings relating to a criminal investigation of the Colombian and Sicilian Mafia); *Fitzgibbon v. C.I.A.*, 911 F.2d 755 (D.C. Cir. 1990) (seeking disclosure of various CIA documents and the location of a certain CIA station); *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) (seeking disclosure of CIA and FBI investigation documents). In such cases, the presumption in favor of disclosure must yield to overriding concerns for public safety and national security—concerns not relevant to the case at bar.

Moreover, none of these cases presented a scenario in which the government had already provided a no-strings-attached disclosure of the confidential information to a private third party.[1] In the closest case, *Students Against Genocide*,

---

[1]Even a case applying the public domain test to Exemption 4 concerned publicly available SEC forms and a request for Federal Reserve docu-

the government revealed certain classified photos document-ing Bosnian Serb atrocities committed in 1995 to the U.N. Security Council. 257 F.3d at 836. The photos were displayed for Council members, but were neither distributed to nor turned over to members' possession for further analysis. *Id.* at 837. This careful procedure prevented Council members from learning about the highly-classified technical capabilities of U.S. reconnaissance systems (the basis for the government's exemption claim). *Id.* By contrast, an aggrieved trademark owner (who receives a Notice of Seizure) can freely dissemi-nate that information in ways that would compromise the pur-portedly sensitive information about an offending importer's trade operations.

**[9]** Taken to its logical extreme, the "public domain" test would still shield commercial information under Exemption 4 even if CBP or an aggrieved trademark owner opened up the phonebook and faxed a copy of the seizure notice to every importer in the region, provided the disclosures were not pre-served in some public record. Therefore, it should make no difference that the disclosure was not preserved in a "perma-nent public record" in this case. While the public domain test will be persuasive in most cases, it does not reach the con-cerns of confidentiality in circumstances like those presented in this case. Therefore, when an agency freely discloses to a third party confidential information covered by a FOIA exemption without limiting the third-party's ability to further disseminate the information then the agency waives the ability to claim an exemption to a FOIA request for the disclosed information.

### 4.

Watkins's argument that CBP could not assert a claim of competitive harm without presenting affidavits from entities

---

ments on a bank merger application, *see Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 463 F.3d 239 (2d Cir. 2006), not a direct disclosure by an agency to a third party.

named in the Notices of Seizure is foreclosed by *Lion Raisins*. *See* 354 F.3d at 1079.

## B.   CBP FOIA Fee Calculations

The CBP's FOIA fee decision is reviewed for arbitrariness and capriciousness. *Citizens to Preserve Overton Park, Inc. v. Volpe* sets out the standard of review for "arbitrary and capricious" and holds that the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971). The Court further stated that the inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." *Id.*

CBP's regulations that set out their FOIA fee schedule can be found at 19 C.F.R. Part 103.10. According to that section, "[i]n general, [t]he fees prescribed in this section are for search and duplication and under no circumstances is there a fee for determining whether an exemption can or should be asserted, for deleting exempt matter being withheld from records to be furnished, or for monitoring a requestor's inspection of records made available in this matter." 19 C.F.R. § 103.10(a)(1). On the other hand, DHS's fee regulations state a fee must be charged for "the examination of a record located in response to a request in order to determine whether any portion of it is exempt from disclosure." 6 C.F.R. § 5.11(b)(7). In addition, DHS's regulations allow for this fee to be collected "before sending copies of requested records to a requestor." 6 C.F.R. § 5.11(a).

According to 6 C.F.R. § 5.1(a)(2) these fees apply to all components of DHS (which includes CBP). However, an exemption to these fees exists, and it states:

> [t]he provisions established by this subpart shall apply to all Department components that are trans-

ferred to the Department. *Except to the extent a Department component has adopted separate guidance under FOIA,* the provisions of this subpart shall apply to each component of the Department. Departmental components may issue their own guidance under this subpart pursuant to approval by the Department.

6 C.F.R. § 5.1(a)(2) (emphasis added).

**[10]** "It is a familiar rule of administrative law that an agency must abide by its own regulations." *Fort Stewart Schools v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 547 (1959)). The CBP stated in its reply brief, "the better and cleaner practice may have been to repeal the obsolete fee provisions . . . ," but it failed to do so. (RB 44-45). The history of the CBP's fee regulations demonstrate that they have not been repealed. They are in effect. The DHS exemption to its fee regulations states "*[e]xcept* to the extent a Department component has adopted separate guidance under FOIA" DHS's fee regulations will control. 6 C.F.R. § 5.1(a)(2). CBP's FOIA fee regulation was promulgated in 1981. (GB 18). Since that time, including the incorporation of CBP into DHS, CBP has continued to keep these regulations active by amending them and never repealing them. Regardless of the district court's assertion that the revisions were merely technical (ER 12), they were revisions that demonstrate that the fee regulations are still valid. CBP's website even directs individuals to 19 C.F.R. § 103, and not to DHS's fee provisions, which are located at 6 C.F.R. § 5.11.

Until CBP repeals the FOIA fee provisions found at 19 C.F.R. § 103, they remain valid, and CBP must follow them.

**[11]** The district court's ruling is affirmed as it regards FOIA Exemption 4. However, the district court's conclusion as to the fees charged to Watkins is reversed. We remand for

the district court to determine the appropriate relief. The parties will bear their own costs.

**AFFIRMED IN PART, and REVERSED IN PART.**

---

RYMER, Circuit Judge, concurring in part and dissenting in part:

I part company only with respect to whether we should adopt the "public domain" test for waiver embraced by the D.C. Circuit and the Second Circuit. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001); *Cottone v. Reno*, 193 F.3d 550, 554-55 (D.C. Cir. 1999); *Fitzgibbon v. CIA*, 911 F.2d 755,765-66 (D.C. Cir. 1990); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983); *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006). I think we should. Not only would adopting this test put us in line with other circuits, but unlike the majority's retreat from the public domain test, it is a clear rule that can be applied without guesswork.

For the public domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record." *Cottone*, 193 F.3d at 554; *see Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992). "[W]e must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver." *Cottone*, 193 F.3d at 555. In other words, the information must be "freely available." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989).

Although the agency is statutorily required to disclose information contained in the Notices of Seizure to affected trademark holders, this limited disclosure to interested third-

parties is not otherwise in the "public domain" or "freely available." Thus, in my view, the CBP did not waive Exemption 4.

---

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from Part A.2 of the majority opinion, because the government has not borne its burden of showing that the Notices of Seizure fall within the "trade secrets" exemption, 5 U.S.C. § 552(b)(4) ("Exemption 4"). Otherwise, I concur in the majority opinion.

## I.

Although FOIA provides nine enumerated exemptions allowing the government to withhold certain information from the public, 5 U.S.C. § 552(b), there is a " 'strong presumption in favor of disclosure,' " *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quoting *U.S. Dept. of State v. Ray*, 502 U.S. 164, 173 (1991)). Consistent with the presumption in favor of disclosure, we must construe the exemptions narrowly. *Id.* (citation omitted). "An agency that invokes one of the statutory exemptions to justify the withholding of any requested documents or portions of documents bears the burden of demonstrating that the exemption properly applies to the documents." *Id.*; *see U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).

Here, the parties dispute whether the commercial information in the Notices of Seizure is "confidential" within the meaning of Exemption 4. The exemption "prevents disclosure of (1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential."[1] *G.C. Micro Corp. v. Def. Logistics Agency*, 33

---

[1]The Act specifically provides: "(b) This section [requiring disclosure of information] does not apply to matters that are–

F.3d 1109, 1112 (9th Cir. 1994). "Confidential" material means information whose disclosure is "likely to . . . cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* Substantial harm "should not be taken to mean simply any injury to competitive position . . . ." *Pub. Citizen Health Research Group v. F.D.A.*, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983) (quotation marks and citation omitted). Instead, substantial harm is determined by the "harm flowing from the affirmative use of proprietary information by *competitors*." *Id.* Although "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] . . . [c]onclusory and generalized allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* at 1291 (citations omitted); *see G.C. Micro Corp.*, 33 F.3d at 1115. The parties opposing disclosure need not show actual competitive harm, but must produce "evidence revealing (1) actual competition [in the relevant market] and (2) a likelihood of substantial competitive injury . . . ." *G.C. Micro Corp.*, 33 F.3d at 1113 (citation omitted; alteration added).

CBP failed to meet this burden. Even assuming CBP can establish, *a priori*, that the markets for all products imported into the United States are "actually competitive," it did not demonstrate in this record a likelihood of substantial competitive injury to importers whose products have been seized as counterfeit. The Agency asserted in its affidavits to the district court that disclosure of the Notices of Seizure would:

> (1) "provide competitors, presumably other importers, with valuable insight into importers' supply

---

. . . .

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential . . . ." 5 U.S.C. § 552(b)(4).

chains, patterns of importation and distribution, assessments of customer demands and business relationships"; (2) be unfair to importers who "expend considerable sums of money to locate and establish business relationships with manufacturers and suppliers of merchandise in the overseas market place" because "the importer could be cut out entirely of various business transactions, as consignees or distributors seek to deal directly with the manufacturer, without the importer's participation"; and (3) "may lead consumers to believe that the importer identified in the Notice does business in counterfeit goods."

## A.

On *de novo* review, allegations (1) and (2) are meritless, because they make only speculative and generalized statements about the potential consequences of disclosure. First, the information in the Notices of Seizure provides questionable added utility to competitors. The Notices include: (1) the date of importation; (2) the port of entry; (3) a description of the merchandise; (4) the quantity involved; (5) the name and address of the manufacturer; (6) the country of origin; (7) the name and address of the exporter; and (8) the name and address of the importer. *See* 19 C.F.R. § 133.21(c). The only information in the Notice that has not already been publicly disclosed in the carrier manifest is the name and address of the importer's manufacturer and exporter.[2] Thus, assuming a

---

[2]Carriers must file manifests with the CBP (which are publicly disclosed) that provide descriptive details of their cargo, including: (1) the name and address of the importer and the name and address of the shipper; (2) the general character of the cargo; (3) the number of packages and gross weight; (4) the name of the vessel; (5) the seaport of loading; (6) the seaport of discharge; (7) the country of origin of the shipment; and (8) the trademarks appearing on the goods or packages. *See* 19 U.S.C. § 1431(c). Although carriers or importers can file for an exemption to the public disclosure requirements under 19 U.S.C. § 1431(c)(2), or apply for confidential treatment with CBP under § 1431(c)(1)(A), this was apparently not an issue for any of the shipments in this case.

competitor could actually discover "patterns of importation and distribution and assessments of customer demands" from a *single* Notice of Seizure, the Notice reveals little information that could not already be gleaned from public shipping manifests.

Further, CBP fails to explain how revealing an importer's supplier of *illicit* goods creates a "likelihood of substantial competitive harm." Notices of Seizure are issued only after CBP officials discover and detain items with a "spurious trademark that is identical to, or substantially indistinguishable from, a registered trademark." 19 C.F.R. § 133.21(a)-(c); *see id.* § 133.22(a). If an importer cannot obtain written permission from the trademark owner to import counterfeit articles during the detention period, the articles are forfeited, *see id.* § 133.21(b), § 133.22(b)-(c), and the importer incurs substantial civil fines, *see* 19 U.S.C. § 1526(f).[3] The Agency also makes samples of the counterfeit articles available to the trademark owner "for examination, testing, or other use in pursuit of a related private civil remedy for trademark infringement." *Id.* § 133.21(d).

Thus, competitors have a significant incentive *not* to work with manufacturers and other supply chain entities implicated in a counterfeiting seizure. The last supply network a reputable importer would want to mirror is one involving manufacturers and exporters either suspected of or implicated in a counterfeiting operation, because future shipments from those entities will be subjected to additional scrutiny from the U.S. government. The mere suspicion of counterfeiting risks costly delays and legal entanglements that could jeopardize an

---

[3]The fine for "any person who directs, assists financially or otherwise, or aids and abets the importation of [counterfeit] merchandise . . . that is seized" may be up to "value that the merchandise would have had it if were genuine, according to the manufacturer's suggested retail price . . . ." 19 U.S.C. § 1526(f)(1)-(2). The fine for a *second* seizure may be up to "twice the value that the merchandise would have had if it were genuine . . . ." *Id.* § 1526(f)(3).

importer's reputation and future business with aggrieved clients. If manufacturers implicated in a Notice of Seizure are indeed involved in counterfeiting—as most of them presumably are—developing a business relationship with them would only invite investigations and set importers up for crushing civil penalties and shipment forfeiture. The notion, then, that competitors will rush to exploit information about manufacturers and exporters implicated in a Notice of Seizure is, at best, doubtful.

In the minority of cases where a shipment is seized by mistake, the situation is decidedly different. Disclosing the Notice of Seizure could plausibly reveal valuable information about an importer's legitimate supply chain network. However, here, the Agency failed to inform us if any of the Notices requested by Watkins involved mistaken seizures. It simply explained that "a seizure notice reflects only a *suspicion* that the goods at issue are counterfeit." This explanation ignores the fact that seizure involves mandatory detention of the goods, and the importer then bears the burden of proving the goods are *not* illicit contraband at the risk of forfeiting the shipment, incurring substantial fines, and subjecting itself to civil counterfeiting liability to the rightful trademark owner. As such, a Notice of Seizure represents much more than mere "suspicion" of counterfeiting—it creates a rebuttable *presumption* of counterfeiting liability.

Even if a case could be made for exempting from disclosure those Notices of Seizure that involve mistaken detainment, CBP did not identify which of the Notices would meet such description. Indeed, the Agency's affidavits and briefs provide no details about the specific Notices requested by Watkins, averring rather that because some of the Notices might reveal trade secrets, all of the Notices should be exempted from disclosure. Yet, as even the majority acknowledges, "*generalized* allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." *Public Citizen*,

704 F.2d at 1291 (emphasis added). Therefore, on *de novo* review, the Agency failed to rebut the "strong presumption in favor of disclosure," *see Lahr*, 569 F.3d at 973, because its allegations do not "demonstrat[e] that the exemption properly applies to [*all*] the documents" requested by Watkins, *id.* (citing *Ray*, 502 U.S. at 173) (alteration added); *see Public Citizen,* 704 F.2d at 1291 n.30.

## B.

Finally, allegation (3)—which complains that consumers may be led "to believe that the importer identified in the Notice does business in counterfeit goods"—does not address a competitive injury cognizable under Exemption 4. It focuses on the revelation of potentially embarrassing information to *consumers*, not the revelation of proprietary information to competitors. *See* 5 U.S.C. 552(b)(4); *Pub. Citizen Health*, 704 F.2d 1280, 1291 n.30 ("We emphasize that . . . competitive harm in the FOIA context . . . [is] limited to harm flowing from the affirmative use of proprietary information by *competitors*.' " (citation omitted)).