PRISON LEGAL NEWS, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., Defendants.

Case No. C14–479 MJP.

United States District Court, W.D. Washington, at Seattle.

Signed June 18, 2015.

Angela C. Galloway, Eric M. Stahl, Davis Wright Tremaine, Seattle, WA, Lance Weber, Lake Worth, FL, for Plaintiff.

Kayla Stahman, U.S. Attorney's Office, Seattle, WA, for Defendants.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARSHA J. PECHMAN, Chief Judge.

THIS MATTER comes before the Court on the Parties' cross-motions for summary judgment. (Dkt. Nos. 24, 28.) Having considered the Parties' briefing and the related record, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 24) and DENIES Defendants' Cross-Motion for Summary Judgment (Dkt. No. 28).

## Background

Plaintiff Prison Legal News, a monthly news magazine dedicated to reporting and advocacy concerning the elevated telephone rates that prisons and contractors charge incarcerated people, brings suit against the Department of Homeland Security ("DHS") and Immigration and Cus-

toms Enforcement ("ICE") alleging that various actions taken by Defendants have violated the Freedom of Information Act ("FOIA"). (Dkt. No. 33.)

Prison Legal News is a project of the Human Rights Defense Center ("HRDC"), a nonprofit charitable organization that focuses on "public education, prisoner education, advocacy and outreach in support of the rights of prisoners and in furtherance of basic human rights." (Dkt. Nos. 24 at 7, 25 at 1–3.) For several years, Plaintiff and HRDC have been gathering information through public records requests about prison phone policies and practices, with special focus on identifying where prisoners are charged high rates for basic telephone services. (Dkt. No. 25 at 1–3.) In 2013, HRDC staff members testified before the Federal Communications Commission ("FCC") about capping prison phone rates, and the FCC cited Plaintiff and HRDC more than forty-five times in its report and order implementing new regulations of prison telecommunications companies. (Dkt. No. 25 at 59–189.) Plaintiff's FOIA records requests in this case also sought information related to telephone practices and policies as part of the same investigative project, this time targeted towards ICE's federal immigration detention centers. (Dkt. Nos. 24 at 7–9, 25 at 1–3.)

Plaintiff's first FOIA request was mailed to Defendants on July 30, 2013, and was signed for by Defendants on August 5, 2013. (Dkt. No. 25 at 3, 213–17.) Plaintiff asserts that it never received a response to this request. (Id. at 3.) Defendants assert that they issued a request acknowledgment letter on August 7, 2013, and have produced evidence that a responsive letter was generated, though not that it was mailed. (Dkt. Nos. 29 at 4, 29–1.) Regardless of whether the response letter was sent or not, Plaintiff informed Defen-

dants by letter dated December 21, 2013, that Plaintiff had not received any response but remained interested in the information. (Dkt. No. 25 at 3, 219.) It is uncontested that Defendants received but did not respond to the second letter. (Id.)

On April 2, 2014, Plaintiff filed this suit, alleging that Defendants were violating FOIA by failing to respond to its two requests. (Dkt. No. 1.) Plaintiff then received the first round of responsive records from ICE on August 1, 2014. (Dkt. Nos. 25 at 3–4, 29.) In the months between September 2014 and February 2015, ICE produced several additional rounds of records and several rounds of reprocessed and corrected records. (Id.)

Portions of the produced records were redacted pursuant to FOIA Exemptions 4 (confidential commercial information), 6 (personal privacy), 7(C) (law enforcement personal privacy), and 7(E) (law enforcement techniques and procedures). (Dkt. Nos. 25 at 3–4, 29 at 12.) In January 2015, Plaintiff amended its complaint to clarify that it sought to challenge not only ICE's failure to timely respond to its FOIA requests (the only disputed issue at the time the suit was filed), but also ICE's Exemption 4 and 7(E) redactions in the documents produced by ICE between August and December 2014. (Dkt. Nos. 24 at 11, 33.)

After Plaintiff amended its complaint and filed its motion for summary judgment arguing that Defendants had failed to properly respond to its FOIA requests and had improperly redacted non-exempt public information under Exemptions 4 and 7(E), ICE determined that information redacted pursuant to Exemption 7(E) "had previously been publicly disclosed," and thus produced the unredacted documents in full. (Dkt. No. 28 at 2 n. 1.)

Accordingly, the only remaining issue regarding redactions involves ICE's Ex-

emption 4 redaction of Talton Communications, Inc.'s performance incentive rate, which reflects a percentage of revenue earned by the phone services contractor that is set aside in escrow and only paid to the contractor upon ICE's determination that Talton has performed the contract successfully. (Dkt. Nos. 28, 36.) ICE redacted the incentive rate used by Talton in its successful 2009 contract bid because it determined that disclosing the rate would result in competitive harm to Talton when it bids for subsequent contracts, including the contract to be bid for in 2015. (Dkt. Nos. 28, 37.) Plaintiff contends the rate was improperly redacted because this information is not exempt under proper application of Exemption 4. (Dkt. Nos. 24, 36.)

## Discussion

### I. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing whether a party has met its burden, the underlying evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ The Court conducts a de novo review of an agency's response to a FOIA request. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). When presented with a summary judgment motion in a FOIA case, courts follow a two-step inquiry. *See, e.g., Los Angeles Times*

*Commc'ns, LLC v. U.S. Dep't of the Army*, 442 F.Supp.2d 880, 892–94 (C.D.Cal.2006). First, courts evaluate whether the agency has met its burden of proving that it fully discharged its obligations under FOIA. *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir.1985) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350–1351 (D.C.Cir.1983)). To do this, the agency must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents. *Id.* Second, if the agency satisfies its initial burden, courts determine whether the agency has proven that the information that it did not disclose falls within one of the nine FOIA exemptions. *Dobronski v. FCC*, 17 F.3d 275, 277 (9th Cir.1994). In meeting its burden, the government may not rely on conclusory and generalized allegations of exemptions. *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir.1980) (citing *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C.Cir.1973)). Furthermore, these exemptions "must be narrowly construed" so as not to undermine FOIA's basic purpose: "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) (internal quotation marks and citations omitted).

■ In sum, in order to prevail on summary judgment, the agency must prove "it has fully discharged [these burdens] under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1382 (8th Cir.1985) (citing *Weisberg*, 705 F.2d at 1350); *see also Zemansky*, 767 F.2d at 571.

## II. Redactions Pursuant to Exemption 4

Plaintiff argues that Defendants cannot meet their burden of proving that Talton Communications is likely to suffer substantial competitive harm if the performance incentive rate from its successful 2009 detainee telephone services contract bid is disclosed, and therefore that the performance incentive rate is not exempt from disclosure. (Dkt. Nos. 24 at 16, 36 at 5–8.)

■ The trade secret exemption to FOIA states, "[t]his section does not apply to matters that are (4) trade secrets and commercial or financial information obtained from a person and privileged and confidential." 5 U.S.C. § 552(b). "In order to invoke Exemption 4 in the Ninth Circuit, the government agency must demonstrate that the information it sought to protect is (1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential." Watkins v. U.S. Bureau of Customs & Border Prot., 643 F.3d 1189, 1194 (9th Cir.2011) (internal quotations marks omitted). Commercial or financial information is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Id.

■ Where, as here, resolution of the issue before the Court turns on the "substantial harm" prong, the government need not show that releasing the information would cause "actual competitive harm." Watkins, 643 F.3d at 1194. Rather, the government need only show that there is: "(1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released." Id. "Competitive harm analysis is . . . limited to harm flowing from the affirmative use of proprietary information by competitors. Competitive harm should not be taken to mean simply any injury to competitive position. . . . Although the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] . . . [c]onclusory and generalized allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." Id. at 1195 (internal quotation marks and citations omitted).

■ Defendants argue that disclosure of the performance incentive rate would result in substantial competitive harm to Talton Communications and would undermine the integrity of the bidding process for ICE's future telephone services contracts because Talton's competitors could use the information to underbid Talton. (Dkt. No. 28 at 13–16.) Defendants contend that ICE considered three factors in awarding the 2009 telecommunications contract—(1) technical and management capabilities, (2) past performance, and (3) price—and that Talton was successful in securing the 2009 contract because it offered the lowest price proposal that was technically acceptable. (Dkt. Nos. 28 at 14, 32 at 2–7, 38 at 6–8.) Included in the price proposal were the telephone rates to be charged to detainees—which are now posted publicly at ICE's Northwest Detention Center and which were already disclosed to Plaintiff—and the performance incentive rate. (Id.) Defendants submit that because Talton's telephone rates are available to its competitors, the "only competitive edge Talton still has over its competitors in future bids is its strategy regarding the percentage of the revenue the company agreed to set aside as a perform-

ance incentive in order to win the current Detainee Telephone System contract." (Dkt. No. 32 at 7.) Defendants also note that Talton invested considerable resources, including hiring an outside consultant, to develop an attractive bid for the 2009 contract, which included developing a "risk allocation approach" that Defendants contend would be revealed if the performance incentive rate were disclosed. (Dkt. Nos. 28 at 14–15, 31 at 1–6.)

Defendants have not met their burden of demonstrating a likelihood of substantial competitive injury to Talton upon disclosure of its 2009 performance incentive rate, and therefore the performance incentive rate is not exempt from disclosure under FOIA. Defendants base their arguments on the theory that disclosing Talton's 2009 performance incentive rate would expose Talton's current risk tolerance, without reciprocal disclosures from its competitors, therefore providing competitors with an unfair advantage in the bidding process for upcoming contracts by allowing them to estimate and undercut Talton's bids. (Dkt. Nos. 28 at 14, 31 at 36, 32 at 5–7, 37 at 4, 38 at 6–8). But the performance incentive rate to be disclosed would reveal only Talton's risk tolerance in 2009, based on the state of the company then, as evaluated by a consultant hired to craft a bid specifically for the 2009 contract. (See Dkt. No. 31.) There is no indication in the record that Talton Communications in 2015 is in exactly the same financial position as it was in 2009; Talton today may have a higher or lower risk tolerance than it did in 2009. Because Talton is free to determine its current risk tolerance separate from its 2009 risk tolerance, disclosure of the 2009 rate will not provide Talton's competitors with insight

into its future bids for future contracts. In other words, disclosure of the 2009 rate, without more, does not allow competitors to "estimate and undercut" Talton's 2015 bid because there is no indication that Talton will use the same rate in 2015.[1] Furthermore, Defendants have provided neither evidence nor argument to explain how disclosure of the 2009 rate would allow competitors to reverse engineer Talton's entire business strategy or its current or future risk tolerance.

Moreover, the record does not support Defendants' contentions that the performance incentive rate was the "single distinguishing and important element of Talton's 2009 [detainee telephone services] proposal which allowed Talton to win the award and will likely be just as significant should Talton choose to compete for the follow-on [detainee telephone services] contract." (Dkt. No. 37 at 4.) Rather, the record shows that price was the deciding factor in 2009, and that the performance incentive rate was one piece of Talton's price proposal. (Dkt. Nos. 32 at 2–7, 38 at 6–8.) The record also shows that ICE evaluates a variety of factors when choosing between proposals, and that the importance of any one of the factors fluctuates according to ICE's evaluation of the proposal's other factors and sub-factors. (Id.) ICE has identified eight sub-factors for the technical and management capabilities category alone. (Dkt. No. 32 at 4.) That a contractor's performance incentive rate will be the single determinative factor in a future bidding process is pure speculation, and, in light of "the strong public interest in favor of disclosure," GC Micro Corp. v. Defense Logistics Agency, 33 F.3d 1109, 1115 (9th Cir.1994), cannot support a finding that

1. Furthermore, it is unclear from the record when bidding for the 2015 contract is expected to take place, and in fact it may have already occurred. The Parties have specified

that Talton's 2009 contract expired on May 12, 2015, (Dkt. No. 38 at 5), but have not specified when a new contract will be bid for or will enter into effect.

Talton is likely to sustain substantial competitive harm from disclosure of the performance incentive rate.

In sum, the Court finds that Talton's performance incentive rate is not exempt from disclosure under FOIA because Defendants have not demonstrated a likelihood of substantial competitive injury to Talton if the rate were disclosed. Defendants must therefore disclose the rate to Plaintiff.

### III. Excessive Delay in Responding to Requests

Plaintiff argues that, in addition to improperly redacting documents, Defendants violated FOIA by failing to timely respond to its FOIA requests. (Dkt. Nos. 24 at 11–13, 36 at 3–5.) Plaintiff requests that the Court declare that ICE's delay in responding has violated the letter and spirit of FOIA. (*Id.*) Defendants admit that they failed to timely respond to Plaintiff's requests, but argue that that failure was inadvertent and that Plaintiff has already availed itself of the proper remedy for that failure—filing suit for immediate judicial review without having to exhaust administrative remedies. (Dkt. Nos. 28 at 16–17, 37 at 7–8.)

FOIA requires an agency to, within twenty days of receiving a record request, (1) determine whether it will comply with a record request, and (2) notify the requester of its determination and its reasoning. 5 U.S.C. § 552(a)(6)(A)(i). The determination response must include: (1) a statement of what the agency will and will not release; (2) the agency's rationale for any withholdings; and (3) notice of the requester's right to appeal. *Id.* Where "unusual circumstances" exist, the Act allows agencies to extend that deadline by as many as ten days. 5 U.S.C. § 552(a)(6)(B)(i).

Declaratory judgment, the granting of which is within the discretion of the Court, is proper when there are purely legal questions at issue and if the judgment will clarify the legal issues and provide clarity to the parties and the public. *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1299 (9th Cir.1992) (granting declaratory relief because the agency "does not have the authority to ignore unambiguous deadlines set by Congress" in Clean Water Act case).

Defendants correctly note that where an agency fails to respond within the statutory time period, the requestor is deemed to have constructively exhausted his or her administrative remedies and may file suit in federal court. (Dkt. No. 37 at 7) (citing 5 U.S.C. § 552(a)(6)(C) and *Citizens for Responsibility and Ethics in Wash. v. FEC*, 711 F.3d 180, 188 (D.C.Cir.2013).) Exhaustion of administrative remedies aside, "[i]t seems fair to say that in the Ninth Circuit, courts sometimes enforce FOIA's timeliness requirements independent of the underlying disclosure issues, at least when the violation is 'egregious' or when there is a 'pattern or practice' of delay." *Munger, Tolles & Olson LLP ex rel. Am. Mgmt. Servs. LLC v. U.S. Dep't of Army*, 58 F.Supp.3d 1050, 1054–55 (C.D.Cal.2014) (collecting cases). *See, e.g., Oregon Natural Desert Ass'n v. Gutierrez*, 409 F.Supp.2d 1237, 1247–48 (D.Or.2006) (holding that an eight month delay was "a violation of FOIA, regardless of the final outcome of the request").

The Court finds the delay in responding to Plaintiff's requests to be egregious. It is uncontested that Plaintiff did not receive ICE's first production of documents (or any other determination) until 361 days after mailing its first FOIA request letter, seven months after mailing its second request letter, and almost four months after filing this lawsuit. (Dkt. Nos. 25 at 2–4, 29 at 12–14.) Production of the remainder of the requested documents was not complet-

ed for several additional months. (*Id.*) Response times of this sort clearly exceed the unambiguous time allowance contemplated by Congress. *See* 5 U.S.C. § 552(a)(6)(A)(i). Consequently, the Court hereby declares that, independent of the exemption issues, Defendants violated FOIA by failing to make a timely determination on Plaintiff's requests.

## IV. Attorney's Fees

■ As the prevailing party, Plaintiff is eligible for reasonable attorney's fees and costs. 5 U.S.C. § 552(a)(4)(E); *Church of Scientology of Cal. v. U.S. Postal Serv.*, 700 F.2d 486, 489 (9th Cir.1983). The Court finds that an award of fees and costs is appropriate in this case, and that Plaintiff is entitled to such an award. *See Church of Scientology of Cal.*, 700 F.2d at 492–93. Therefore, Plaintiff is hereby awarded reasonable attorney's fees and costs, and must petition the Court for a determination of fees and costs within thirty (30) days of the date of this order, if the Parties are unable to agree on a determination.

## Conclusion

Because Defendants have violated FOIA by failing to timely respond to Plaintiff's requests and have failed to prove that Talton's performance incentive rate falls within one of FOIA's exemptions, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendants' Cross–Motion for Summary Judgment. Plaintiff is awarded reasonable attorney's fees and costs, in an amount to be determined later should the Parties be unable to agree on a determination.

The clerk is ordered to provide copies of this order to all counsel.