# United States Court of Appeals
## For the First Circuit

No. 14-1011

NEW HAMPSHIRE RIGHT TO LIFE,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Torruella, Howard, and Kayatta,
Circuit Judges.

Michael J. Tierney, with whom Wadleigh, Starr & Peters, PLLC, was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

February 4, 2015

**KAYATTA, Circuit Judge**.    In 2011, the Department of Health and Human Services ("Department") awarded federal grant funds directly to Planned Parenthood of Northern New England ("Planned Parenthood").    New Hampshire Right to Life ("Right to Life") then filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and ultimately this lawsuit, seeking documents related to the award of that federal grant.    The Department produced some documents, but withheld others, citing FOIA exemptions for confidential commercial information, id. § 552(b)(4) (Exemption 4), and inter- or intra-agency memoranda, id. § 552(b)(5) (Exemption 5).    We affirm the district court's ruling that the Department properly withheld the subject documents under FOIA Exemptions 4 and 5.

### I. Background

### A.    Direct Award Of Federal Grant To Planned Parenthood

Prior to 2011, the Department historically awarded Title X[1] federal grants to New Hampshire, which in turn dispersed a combination of federal and state funds through subgrants to various entities.    Title X federal grants "assist in the establishment and operation of voluntary family planning projects which . . . offer a broad range of acceptable and effective family

---

[1]    Title X refers to Title X of the Public Health Services Act, created by the Family Planning Services and Population Research Act of 1970. Pub. L. 91-572, § 6(c), 84 Stat. 1504, 1506-08, codified as amended at 42 U.S.C. §§ 300--300a-6.

planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). Planned Parenthood historically received one of these subgrants, including Title X federal funds, from New Hampshire. As of July 1, 2011, Planned Parenthood operated clinics in six different New Hampshire municipalities: Manchester, Derry, Keene, Exeter, West Lebanon, and Claremont.

In June 2011, the New Hampshire Executive Council chose not to award any subgrant to Planned Parenthood, expressing concern that taxpayer funds were being used to subsidize abortions.[2] New Hampshire's decision meant that unless a new provider received the funds, large portions of the state would no longer have access to Title X services. In July 2011, the Department asked New Hampshire for information on how it would ensure continued provision of Title X services in areas previously served by Planned Parenthood. In mid-August 2011, the New Hampshire Department of Health and Human Services informed the Department that they could not find a replacement provider for those areas. New Hampshire then relinquished what would have been Planned Parenthood's portion of the federal funds.

The Department considered alternative options, including bypassing New Hampshire's Executive Council, and directly awarding

---

[2] New Hampshire's Executive Council had this concern despite the fact that Title X prohibits the use of its funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

Title X funds to Planned Parenthood. On August 19, 2011, Marilyn Keefe, the Deputy Assistant Secretary of the Department's Office of Population Affairs ("OPA"), signed a memorandum titled, "Sole Source Justification for Replacement Grant in New Hampshire". This memorandum "request[ed] approval [from the Department's Office of the Assistant Secretary of Health ("OASH")] of a sole source replacement grant to [Planned Parenthood] for a period of 16 months." The memorandum "noted an urgent need to reinstate services in [the affected] areas with an experienced provider that is familiar with the provision of Title X family planning services and applicable laws . . . and has a history of successfully providing services in this area of the state." The memorandum explained that, upon approval of its recommendation, "[the OPA] will reach out to the proposed replacement grantee to determine if the organization is willing to take on this project as a directly funded federal grantee." The memorandum also stated that "[t]he Director of the OASH Grants Management Office has consulted with the Office of the General Counsel, which has determined that the use of the replacement grant process is legally justified in this case." The OASH Executive Officer approved the OPA's recommendation by countersigning the memorandum on that very same day--August 19, 2011.

On September 1, 2011, Planned Parenthood applied for the direct award grant. The Department then prepared a "Technical

Review" document, evaluating Planned Parenthood's application. On September 9, the Department announced, via its website, its intent to directly issue a replacement grant to Planned Parenthood. On September 13, the Department formally provided a Notice of Grant Award to Planned Parenthood. The notice required Planned Parenthood to submit to the Department, by December 15, 2011, additional "institutional files" on "a variety of policies and procedures[.]" Responding to this notice, Planned Parenthood submitted its Manual of Medical Standards and Guidelines ("Manual") as well as information on its fee schedule and personnel policies.

**B.  Right To Life's FOIA Challenge And District Court Decision**

On December 22, 2011, Right to Life filed a lawsuit under the FOIA, seeking documents related to the Department's decision to proceed with a direct award process, documents that Planned Parenthood submitted as part of its grant application, and documents related to the Department's decision to award that grant to Planned Parenthood. After being sued, the Department released more than 2,500 pages of documents. The Department determined that some portions of the Manual were exempt from disclosure under the FOIA, but intended to release the remainder, and so informed Planned Parenthood. Planned Parenthood responded by arguing that its entire Manual constituted confidential commercial information, and thus was exempt from disclosure under the FOIA. See 5 U.S.C. § 552(b)(4). The Department rejected this argument. Planned

-5-

Parenthood countered by commencing an action in district court, seeking to enjoin the Department from releasing any portion of the Manual.

The district court remanded the matter to the Department to "reconsider its FOIA determination in light of additional information provided by [Planned Parenthood] about specific portions of the [M]anual, and produce a more comprehensive explanation for any determination that portions of the [M]anual are subject to disclosure despite [Planned Parenthood's] objections." Upon reconsideration, the Department decided to withhold or redact additional portions of the Manual. The Department also continued to withhold various other documents or portions of documents, invoking FOIA Exemptions 4, 5, and 6. The Department gave Right to Life a Vaughn Index, correlating withheld documents to particular FOIA exemptions.[3] Right to Life and the Department then filed cross motions for summary judgment, see Fed. R. Civ. P. 56, to determine whether the Department properly invoked these FOIA exemptions.

---

[3]  A Vaughn index is "[a] comprehensive list of all documents that the government wants to shield from disclosure in Freedom of Information Act (FOIA) litigation, each document being accompanied by a statement of justification for nondisclosure. . . . The name derives from Vaughn v. R[osen], 484 F.2d 820 (D.C. Cir. 1973)." Black's Law Dictionary 1693 (9th ed. 2009). A Vaughn index is necessary in FOIA litigation, as "only the party opposing disclosure will have access to all the facts." Church of Scientology Int'l v. United States Dep't of Justice, 30 F.3d 224, 228 (1st Cir. 1994).

The district court partially granted and partially denied both parties' motions for summary judgment. The district court found that the "vast majority" of documents were properly withheld under FOIA exemptions, but that the Department did not meet its burden to justify withholding a few categories of documents. The district court found that Exemption 4 applied to the Manual, the letter describing the Manual's standards and guidelines, the Fees and Collections Policies, and a document titled "Steps in Establishing our Fee Schedule."

The district court found that Exemption 5 applied to an e-mail chain between Department employees and attorneys relating to the legality of the direct award process, an e-mail chain about the rationale for the replacement grant's funding amount, and multiple drafts of a public announcement of the Assistant Secretary's intent to issue a replacement grant to Planned Parenthood. The district court also found that the Department met its burden for invoking the attorney-client and work product privileges, as recognized by Exemption 5, for various documents.

Right to Life appeals, seeking disclosure of the following documents that are either partially redacted or entirely withheld: the Manual (Vaughn index category 38); a letter describing the Manual (Vaughn index category 39); Planned Parenthood's Fees and Collection Policies (Vaughn index category 37); "Steps to Establishing our Fee Schedule" document (Vaughn

index category 35); and various internal Department communications (<u>Vaughn</u> index categories 11, 15-16, 18-19, 23-25, 30, 33). [BB 19-20, 22, 28-29, 31.]

## II.  Standard of Review

We review de novo the district court's determination that the Department was entitled to summary judgment based on its <u>Vaughn</u> index and affidavits.  <u>Carpenter</u> v. <u>United States Dep't of Justice</u>, 470 F.3d 434, 437 (1st Cir. 2006).  The government bears the burden of demonstrating that a claimed exemption applies.  <u>Church of Scientology Int'l</u> v. <u>United States Dep't of Justice</u>, 30 F.3d 224, 228 (1st Cir. 1994).

## III.  Analysis

The FOIA obligates federal agencies to "make 'promptly available' to any person, upon request, whatever 'records' the agency possesses unless those 'records' fall within any of nine listed exemptions." <u>Id.</u> (<u>quoting</u> 5 U.S.C. §§ 552(a)(3), (b)).  The FOIA's primary purpose is to "open agency action to the light of public scrutiny", "ensur[ing] an informed citizenry, vital to the functioning of a democratic society." <u>Id.</u> (internal quotation marks and citations omitted).  The FOIA is the legislative embodiment of Justice Brandeis's famous adage, "[s]unlight is . . . the best of disinfectants[.]" Louis D. Brandeis, <u>Other People's Money</u> 92 (Frederick A. Stokes Co. 1914); <u>see also</u> <u>Aronson</u> v. <u>I.R.S.</u>, 973 F.2d 962, 966 (1st Cir. 1992) (noting that the FOIA's basic aim is

-8-

"sunlight"). "The policy underlying [the] FOIA is thus one of broad disclosure, and the government must supply any information requested by any individual unless it determines that a specific exemption, narrowly construed, applies." Church of Scientology, 30 F.3d at 228.

Here, the Department relies on FOIA Exemptions 4 and 5 only. Exemption 4 shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Id. § 552(b)(5). As explained below, we hold that the Department met its burden to show that Exemption 4 applies to Planned Parenthood's submitted documents. We also hold that the Department met its burden to show that Exemption 5 applies to its withheld internal documents.

## A. Planned Parenthood Documents

The Department invokes Exemption 4 to prevent disclosing portions of the Manual, a letter describing the Manual, the Fees and Collections Policies, and a document titled "Steps in Establishing our Fee Schedule." In order to properly invoke Exemption 4, the Department must demonstrate that the information

-9-

it seeks to protect is both commercial and confidential.[4] See id. § 552(b)(4). The FOIA does not define the term "commercial," so courts have given the term its ordinary meaning. See Pub. Citizen Health Research Grp. v. Food & Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983); Am. Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978) (noting that "commercial" in the FOIA context "surely means pertaining or relating to or dealing with commerce."). Commercial information is confidential if disclosure is likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 9 to 5 Org. for Women Office Workers v. Board of Governors, 721 F.2d 1, 8 (1st Cir. 1983) (quoting Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974) (footnote omitted)).[5]

---

[4] The Department is not asserting that the submitted information is financial or privileged under Exemption 4. We thus focus only on whether the submitted information is commercial and confidential.

[5] 9 to 5 Org. expressly left open, as do we here, the possibility that information can be confidential if disclosure would harm interests other than the two interests identified in Nat'l Parks. 9 to 5 Org., 721 F.2d at 9 (noting that "[i]f it can be demonstrated with particularity that a specific private or governmental interest will be harmed by the disclosure of commercial or financial information, the Government should not be precluded from invoking the protection of [E]xemption 4 merely because the asserted interest is not precisely one of those two identified in National Parks").

Right to Life makes two arguments for why Exemption 4 does not apply to the requested information: (1) Planned Parenthood, as a non-profit, cannot possess commercial information; and (2) even if Planned Parenthood can possess commercial information, disclosure of the requested information poses no likelihood of substantial harm to Planned Parenthood's competitive position.

**1. Non-profits may possess commercial information.**

Right to Life argues that because Planned Parenthood is a non-profit organization, it cannot be said to possess commercial information within the meaning of Exemption 4. We disagree. If accepted, this argument would amount to a per se exclusion of non-profit entities from protection under Exemption 4. Neither the language of the statute nor common sense lean in Right to Life's favor here. The term "commercial" as used in the statute modifies "information" and not the entity supplying the information. See 5 U.S.C. § 552(b)(4). All sorts of non-profits--hospitals, colleges, and even the National Football League--engage in commerce as that term is ordinarily understood. How the tax code treats income from that commerce is a separate issue that has no bearing on our inquiry here.

Apart from arguing that non-profits cannot possess commercial information, Right to Life does not claim that the

information in the documents is somehow not otherwise commercial.[6] These documents--the Manual, the letter describing the Manual, the fees and collections policies, and the "Steps in Establishing our Fee Schedule" document--outline Planned Parenthood's operations and fees. That is to say, they outline the amounts Planned Parenthood charges customers for its services, and how it produces those services for sale. These documents thus surely pertain or relate to commerce as that term is ordinarily understood. See, e.g., Pub. Citizen Health Research Grp., 704 F.2d at 1290.

### 2. The subject documents are confidential.

We turn now to the question of whether this undoubtedly commercial information is also 'confidential' under FOIA Exemption 4. See 9 to 5 Org., 721 F.2d at 8; 5 U.S.C. § 552(b)(4). Commercial information is confidential under Exemption 4 if disclosure is likely to either: (1) "impair the Government's ability to obtain necessary information in the future"; or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained." 9 to 5 Org., 721 F.2d at 8 (quoting Nat'l Parks, 498 F.2d at 770). The Department is not arguing the first prong. When evaluating the second prong, "the

_____

[6] Right to Life does make a fall back argument that, even if a non-profit can possess commercial information, information tendered in order to get a federal grant (i.e., getting a check for rendering services) is somehow per se non-commercial. But no precedent supports such a claim. Nor can we see any reason why the nature of the information somehow changes when supplied to get such a grant.

-12-

court need not conduct a sophisticated economic analysis of the likely effects of disclosure." Pub. Citizen Health Research Grp., 704 F.2d at 1291. But "[c]onclusory or generalized allegations" will not suffice. Id. Parties opposing disclosure need not demonstrate actual competitive harm; instead, they need only show actual competition and a likelihood of substantial competitive injury in order to "bring [that] commercial information within the realm of confidentiality." Id.; accord Sharkey v. Food & Drug Admin., 250 F. App'x 284, 288 (11th Cir. 2007); Lion Raisins Inc. v. United States Dep't of Agric., 354 F.3d 1072, 1079 (9th Cir. 2004); Utah v. United States Dep't of Interior, 256 F.3d 967, 970 (10th Cir. 2001); Natural Res. Def. Council, Inc. v. United States Dep't of Interior, No. 13 Civ. 942(PAE), 2014 WL 3871159, at *13 (S.D.N.Y. Aug. 5, 2014).

For the purposes of awarding the grant in 2011, both New Hampshire and the Department determined that Planned Parenthood was the only Title X provider in the region. Right to Life contends that the Department cannot change positions and now argue against disclosure on the ground that Planned Parenthood would likely face substantial competitive harm.

Right to Life's view of actual competition is myopic, focusing only on the ad-hoc, non-competitive grant process that took place in 2011. The district court aptly noted that Planned Parenthood faces plenty of competition from other entities for

-13-

patients. Many of Planned Parenthood's services are also provided by hospitals and health clinics. Further, the Title X grant process in New Hampshire will be open to other bids in the future. Even in 2011, a potential competitor--the Manchester Community Health Center--requested information from the Department about applying for the same grant. Although Planned Parenthood admittedly did not compete for the federal grant in 2011, it certainly does face actual competitors--community health clinics-- in a number of different arenas, and in future Title X bids. This satisfies the "actual competition" requirement. See, e.g., Utah, 256 F.3d at 970-71.

Having established that the documents contain commercial information, and that Planned Parenthood faces actual competition in a variety of contexts, we turn to the specific documents Right to Life wants disclosed, and whether disclosure of those documents would likely cause substantial competitive harm to Planned Parenthood.[7]

The Manual, and thus the letter that describes it, "provides a model for operating a family planning clinic and for

---

[7] We gauge the risk of substantial harm to Planned Parenthood's competitive position as of the time of the district court decision. See, e.g., N.Y. Times Co. v. United States Dep't of Justice, 756 F.3d 100, 110 n.8 (2nd Cir. 2014). Requiring an agency to update its FOIA responses "based on post-response occurrences could create an endless cycle of judicially mandated reprocessing." Bonner v. United States Dep't of States, 921 F.2d 1148, 1152 (D.C. Cir. 1991).

providing . . . services consistent with [Planned Parenthood's] unique model of care." The National Medical Committee of Planned Parenthood Federation of America developed the Manual, in collaboration with local affiliate chapters, like the Northern New England branch. Planned Parenthood treated these documents as confidential information not generally available to the public. A potential future competitor could take advantage of the institutional knowledge contained in the Manual, and the letter describing the Manual, to compete with Planned Parenthood for patients, grants, or other funding. We therefore agree with the district court that the Department met its burden for invoking Exemption 4 for the Manual and Medical Standards, and the letter containing descriptions of the same--Vaughn index categories 38 and 39.

The Fees and Collections Policies and the "Steps in Establishing our Fee Schedule" documents contain information that "identifies cost differentials between services, identifies all services provided[,] and sets forth the fee scale." Planned Parenthood treated these documents as confidential information not generally available to the public. Pricing information like that contained in these documents is undoubtedly valuable information for competitors. Nor is there any suggestion that competitors have access to this information (other than perhaps anecdotally and incompletely). We thus agree with the district court that the

Department met its burden for establishing a likelihood of substantial competitive harm from the disclosure of Planned Parenthood's "Steps in Establishing our Fee Schedule" document and its Fees and Collections Policies--Vaughn index categories 35 and 37.[8]

## B.  Department Documents

Right to Life also seeks internal Department documents that are withheld under Exemption 5.  Exemption 5 shields documents that are normally immune from civil discovery, including those protected by the deliberative process and attorney-client privileges. See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 149-55 (1975); see also Elec. Frontier Found. v. United States Dep't of Justice, 739 F.3d 1, 7 (D.C. Cir. 2014) (Exemption 5 applies "to documents that are predecisional and deliberative, meaning they reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated") (quotations and citations omitted); Mead Data Central, Inc. v. United States Dep't of Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977) (Exemption 5 "is intended to protect the quality of agency

---

[8]    The district court applied the lessened standard to voluntary submissions, enunciated in Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992). See New Hampshire Right to Life v. Dep't of Health and Human Serv., 976 F.Supp.2d 43, 54 (D. N.H. Sept. 30, 2013). We decline at this time to adopt that lessened standard for voluntary submissions.

decision-making by preventing the disclosure requirement of the FOIA from cutting off the flow of information to agency decision-makers. Certainly this covers professional advice on legal questions which bears on those decisions."). Exemption 5 protects government "agencies from being 'forced to operate in a fishbowl.'" Id. (quoting Envtl. Prot. Agency v. Mink, 410 U.S. 73, 87 (1973)). It facilitates government decision making by: (1) assuring subordinates will feel free to provide uninhibited opinions, (2) protecting against premature disclosure of proposed government policies, and (3) preventing confusion among the public that may result from releasing various rationales for agency action. Providence Journal Co. v. United States Dep't of Army, 981 F.2d 552, 557 (1st Cir. 1992)(quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)).

Right to Life advances two arguments for rejecting the Department's reliance on Exemption 5: First, it argues that some of the documents that are outside the scope of the attorney-client privilege are also not predecisional as a matter of simple chronology; and, second, it argues that the Department waived any objection to producing the documents that reflect the opinions of Department lawyers because the Department adopted the opinions of legal counsel as policy of the Department. We address each argument in turn.

**1. The withheld documents are all predecisional.**

To fit within Exemption 5, the Department must demonstrate that the communications were both "predecisional" and "deliberative." Providence Journal, 981 F.2d at 557 (internal quotation omitted). Right to Life argues that the documents are not deliberative only because they are not predecisional, so we limit our inquiry to whether they are indeed predecisional. A document is predecisional if the agency can: "(1) pinpoint the specific agency decision to which the document correlates, (2) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (3) verify that the document precedes, in temporal sequence, the decision to which it relates." Id. (internal quotation marks and citations omitted). The dispute here centers on the temporal sequence of Department documents and decisions, and on identifying the decisions to which the particular documents relate. The following chronology outlines the relevant decisional timeline.

On August 8, 2011, there was an e-mail chain (Vaughn index category 11) between Department employees and Office of General Counsel attorneys regarding whether the Department could legally issue a replacement grant. On August 9, Secretary Sebelius was briefed on the issue. Subsequently, on August 10, the White House was also briefed on this alternative plan. Right to Life

asserts that this briefing constituted "approval from the White House." Right to Life cites as evidence of White House "approval" an informal e-mail stating, "[t]he WH was briefed and they are getting down to pennies and nickels." On August 12, there was an e-mail chain (Vaughn index category 15) discussing a draft document regarding funding for the replacement grant. On August 18, there was another e-mail chain addressing funding for the replacement grant (Vaughn index category 18). Finally, on August 19, OASH's executive officer signed a blank line indicating "Approve" underneath the heading "Decision" on the Sole Source Justification memorandum.

On September 28, 2011, three out of five members of the New Hampshire Executive Council filed a letter protesting the Department's decision with the Government Accountability Office ("GAO"), carbon copying Kathleen Sebelius, Department Secretary. In a letter dated October 5, 2011, the GAO declined to review the Executive Council members' protest for lack of jurisdiction. The Department later decided not to provide its own response.

Right to Life contends that the decision to directly award Title X funds to Planned Parenthood was made at the White House briefing on August 10, 2011. If this were true, all pertinent documents created after that date would be post-decisional, and thus not exempt from disclosure under Exemption 5. See id. The record, however, does not support Right to Life's

-19-

contention.  On its face, the e-mail Right to Life cites as evidence of White House approval indicates that a decision, while perhaps close, had not yet been finalized.  The phrase "getting down to pennies and nickels" plainly suggests a pending decision, not a final decision for Exemption 5 purposes.  That leaves August 19--the date the OASH executive signed the approval line on the Sole Source Justification memorandum--as the date the decision was made to proceed with a direct award process.[9]  We therefore reject Right to Life's argument that Vaughn index categories 15–16 and 18–19, all created prior to August 19 were post-decisional documents.[10]

We turn next to the documents covered by Vaughn index categories 23–25 and 33.  All of these documents post-date the August 19 decision to proceed with a non-competitive sole-source grant process.  Therefore, Right to Life argues, they are not pre-decisional.  The problem with this argument is that there were

---

[9]  Throughout its brief, Right to Life touts the title of the "Sole Source Justification" memorandum, and suggests that it indicates that the substance of the memorandum itself is "a post hoc justification of a decision that had been made several days earlier."  Read as a whole, the document's substance makes clear that it is a recommendation letter, seeking approval from a superior: "I recommend that you approve this request for a sole source replacement grant to Planned Parenthood of Northern New England."

[10]  Categories 16 and 19 are undated, but, given their content, necessarily predate the August 19 decision.  Category 16 covers drafts of a rationale for the grant funding amount.  Category 19 covers early drafts of the Sole Source Justification memorandum.

-20-

other relevant decisions made on or after August 19, including: (1) the Department's decision on September 9 to publicly announce its intent to issue the grant award to Planned Parenthood, and (2) the Department's decision to not provide a separate response to New Hampshire's protest of that direct award.

Vaughn index categories 23-25 relate to and pre-date the September 9 public announcement that the Department intended to directly award a grant to Planned Parenthood. These documents deal with the Department's decision of how and what to communicate to the public, which is a decision in and of itself. Vaughn index categories 23-25 are not post-decisional. Right to Life simply misidentifies the decision to which these documents relate.

Similarly, the documents included in Vaughn index category 33 involve communications between Department employees and attorneys relating to whether the Department should also respond to the New Hampshire Executive Council's protest. This e-mail chain necessarily predates any decision by the Department to withhold a separate response to the protest. We are satisfied that the Department appropriately met its burden for withholding these documents under Exemption 5.

**2.   The Department Did Not Waive Its Privileges By Adopting Counsel's Legal Advice.**

In responding to Right to Life's FOIA request, the Department revealed that an attorney in the Office of General Counsel had advised the Director of the OASH Grants Management

Office that it was legal to issue a replacement grant. The Department redacted any material that revealed the basis or reasoning behind such advice. The Department never publicly announced either the advice or the reasoning behind the advice. Nor does it rely on the advice in this litigation.

Right to Life advances a single argument for finding that the Department must now produce the communication with OCG counsel. It claims that, by issuing the replacement grant, the Department adopted counsel's advice as "policy of the Agency."[11]

The record provides no factual support for this claim unless one presumes that every time an agency acts in accord with counsel's view it necessarily adopts counsel's view as "policy of the Agency." As a categorical rule this makes no sense, especially where counsel's legal advice is simply that there is no impediment to the agency doing what it wants to do.

For precedent, Right to Life points only to Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975), and Brennan Center v. United States Dep't of Justice, 697 F.3d 184 (2nd Cir. 2012). Each of these opinions, however, hinged disclosure of legal counsel's advice on whether the agency actually adopted the reasoning behind counsel's opinion as its own. See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184–85 (1975)

--------

[11] Right to Life does not argue that the Department waived its privilege by failing to redact from the Sole Source Justification memorandum the short description of the conclusion of counsel.

-22-

(companion case to Sears, holding that "[if] the evidence utterly fails to support the conclusion that the reasoning in the reports is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report, . . . the reports are not final opinions and do fall within Exemption 5."); Brennan Center, 697 F.3d at 197 ("[T]he fact that the agencies acted in conformity with the . . . memoranda [does not] establish that the agencies adopted their reasoning."). Here, the Department never adopted, or even mentioned, counsel's reasoning.

"Mere reliance on a document's conclusions"--at most what we have here--"does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference." National Council of La Raza v. Dep't of Justice, 411 F.3d 350, 358 (2nd Cir. 2005); Elec. Frontier Found. v. United States Dep't of Justice, 739 F.3d 1, 10-11 (D.C. Cir. 2014) ("[T]he Court has refused to equate reference to a report's conclusions with adoption of its reasoning, and it is the latter that destroys the privilege.")

It is a good thing that Government officials on appropriate occasion confirm with legal counsel that what the officials wish to do is legal. To hold that the Government must turn over its communications with counsel whenever it acts in this manner could well reduce the likelihood that advice will be sought. Nothing in the FOIA compels such a result.

## IV.  Conclusion

For the foregoing reasons, we <u>affirm</u> the district court's rulings.

<u>So ordered</u>.