**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CENTER FOR INVESTIGATIVE REPORTING; WILL EVANS,

        *Plaintiffs - Appellees*,

  v.

UNITED STATES DEPARTMENT OF LABOR,

        *Defendant - Appellant*.

No. 24-880

D.C. No.
3:22-cv-07182-WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted February 14, 2025
San Francisco, California

Filed July 30, 2025

Before: N. Randy Smith and Anthony D. Johnstone, Circuit
Judges, and Dana L. Christensen, District Judge.[*]

Opinion by Judge Johnstone

---

[*] The Honorable Dana L. Christensen, United States District Judge for
the District of Montana, sitting by designation.

## SUMMARY[**]

### Freedom of Information Act

The panel affirmed the district court's order compelling disclosure in a Freedom of Information Act ("FOIA") case brought by the Center for Investigative Reporting requesting several years of reports filed by federal contractors with the U.S. Department of Labor.

The reports describe the composition of the contractors' workforces. The Center, a nonprofit investigative news organization, hoped to use the information to report on contractors' racial, sexual, and ethnic diversity (or lack thereof). The Department withheld many of the requested reports under FOIA's Exemption 4, claiming they included confidential "commercial" information.

Information is "commercial" under Exemption 4 if it is an object of commerce or has commerce as its subject. The panel held that because the record did not show that workforce-composition information alone revealed contractors' production details or resulting profits, the reports at issue did not contain "commercial" information subject to FOIA Exemption 4. Accordingly, the panel affirmed the district court's order concluding that the Department must disclose the reports.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# COUNSEL

Aaron R. Field, Therese Y. Cannata, and Zachary Colbeth, Cannata O'Toole & Olson LLP, San Francisco, California; D. Victoria Baranetsky, The Center for Investigative Reporting, San Francisco, California; for Plaintiffs-Appellees.

Pamela Johann, Assistant United States Attorney; Ismail J. Ramsey, United States Attorney; Office of the United States Attorney, United States Department of Justice, San Francisco, California; Joshua M. Koppel and Mark B. Stern, Attorneys, Appellate Staff; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Emily S. Whitten, Attorney; Seema Nanda, Solicitor of Labor, United States Department of Labor, Washington, D.C.; for Defendant-Appellant.

Mason A. Kurtz, Cyberlaw Clinic, Harvard Law School, Cambridge, Massachusetts, for Amici Curiae Knowledge Ecology International, Universities Allied for Essential Medicines, Dr. Christopher Morten, and Dr. Reshma Ramachandran.

Katie B. Townsend, Bruce D. Brown, Mara Gassmann, Adam Marshall, and Mayeesha Galiba, Reporters Committee for Freedom of the Press, Washington, D.C.; for Amici Curiae Reporters Committee for Freedom of the Press and the First Amendment Coalition.

Larissa R. Grijalva, Angelica Salceda, and Grayce S. Zelphin, American Civil Liberties Union Foundation of Northern California, San Francisco, California, for Amici Curiae American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern

California, and American Civil Liberties Union of San Diego-Imperial Counties.

---

**OPINION**

JOHNSTONE, Circuit Judge:

Congress enacted the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to ensure public access to federal-government records and thereby increase the transparency of the government to the governed. The statute requires federal agencies to disclose their records to the public upon request. If an agency denies a request, members of the public may sue to compel disclosure. But FOIA allows agencies to withhold government records if they fall within one of nine statutory exemptions. These exemptions protect information about various matters—classified national defense materials, law-enforcement records, personnel and medical files, and documents relating to the regulation of financial institutions, to name a few—that may legitimately be kept from public view.

This appeal is about FOIA Exemption 4, which allows agencies to withhold "trade secrets" and "commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). The exemption protects entities that are required to submit information to the federal government against the competitive disadvantages that could result from disclosure of their private business information. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). Most litigation involving Exemption 4 centers on whether

information is a "trade secret[]" or otherwise "confidential." *See, e.g.*, *id.* at 433–40; *Bowen v. FDA*, 925 F.2d 1225, 1227–28 (9th Cir. 1991). Here, however, the parties dispute the meaning of "commercial."

Plaintiffs Will Evans and the Center for Investigative Reporting (together, "Center") requested several years' worth of reports filed by federal contractors with the Department of Labor ("Department"). The reports describe the composition of the contractors' workforces, including the job categories and demographics of their employees. The Center, a nonprofit investigative news organization, hoped to use that information to report on contractors' racial, sexual, and ethnic diversity (or lack thereof). The Department withheld many of the requested reports under Exemption 4, claiming that they include confidential "commercial" information. After the Center sued, the district court determined that the reports contain no "commercial" information and ordered the Department to disclose the reports. The Department appealed.

Information is "commercial" under Exemption 4 if it either is an object of commerce or has commerce as its subject. That is, "commercial information" (1) is made to be bought and sold or (2) describes an exchange of goods or services for profit. The Department argues that the information it seeks to withhold is "commercial" because it describes the composition of contractors' workforces, which influences the number and quality of services that contractors can exchange for profit. Because the record before us does not show that workforce-composition information alone reveals contractors' production details or resulting profits, we hold that the reports at issue do not contain "commercial" information. We therefore affirm the

district court's order compelling the Department to disclose the reports.

## I. The Department withholds federal contractors' workforce-composition information.

Until recently, the Department required most federal contractors with fifty or more employees to submit annual reports detailing the composition of their workforces. *See* 41 C.F.R. § 60–1.7(a); Exec. Order No. 11246, 30 Fed. Reg. 12319 (Sept. 24, 1965), *revoked by* Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025). Contractors with more than one place of business submitted consolidated reports of aggregated workforce-composition data across all their locations. The reports included contractors' number of employees in each of ten job categories: Executive/Senior Level Officials and Managers, First/Mid-Level Officials and Managers, Professionals, Technicians, Sales Workers, Administrative Support Workers, Craft Workers, Operatives, Laborers and Helpers, and Service Workers. They also broke down the number of employees in each job category by sex and by race or ethnicity. The Department used the reports to monitor contractors' compliance with federal antidiscrimination and equal employment opportunity requirements. *See* 41 C.F.R. § 60–1.7(c), *revocation proposed by* Rescission of Executive Order 11246 Implementing Regulations, 90 Fed. Reg. 28472-01 (proposed July 1, 2025).

The Center submitted several FOIA requests for consolidated reports from contractors with multiple locations filed between 2016 and 2020 ("EEO reports"). The Department determined that the EEO reports "may be protected from disclosure under FOIA Exemption 4," which allows withholding of certain confidential "commercial or

financial information." 5 U.S.C. § 552(b)(4). As required by federal regulations, the Department provided the contractors who filed the reports with notice and an opportunity to object to the Center's FOIA requests. *See* 87 Fed. Reg. 51145 (Aug. 19, 2022). After the objection process, the Department disclosed the EEO reports of all non-objecting contractors, but withheld 16,755 EEO reports from 4,141 objecting contractors based on its assessment that the reports fell under Exemption 4. (The Department also withheld the reports of 621 objectors who it determined were not federal contractors at the time their reports were filed and were thus outside the Department's jurisdiction. Those reports are not at issue in this appeal.)

The Center sued to compel disclosure of all the requested EEO reports under FOIA. After the pleading stage, the district court instructed the Department "to select six representative objecting contractors to be the subject of bellwether cross-motions for summary judgment." Though FOIA generally requires an individualized analysis of each record withheld, *see Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771, 781–82 (9th Cir. 2022), neither party objected to the use of bellwethers to test the Department's Exemption 4 argument, and the Department selected its six preferred contractors to show that the EEO reports contain confidential "commercial" information. Five bellwether objectors ultimately participated: (1) Allied Universal, "the nation's largest provider of security guards"; (2) Brandenburg Industrial Service Co., a firm "specializing in demolition and environmental remediation"; (3) DHL Global Business Services, a provider of "logistics services"; (4) NMR Consulting, which "provide[s] information technology, infrastructure, and procurement services"; and

(5) NorthShore University Health System, a "community-based healthcare system."

On cross-motions for summary judgment based on the bellwethers, the district court ordered the disclosure of the EEO reports. *See Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*, No. 3:22-cv-07182, 2023 WL 8879244, at *8 (N.D. Cal. Dec. 22, 2023). The court construed Exemption 4's protections for "commercial" information to cover only "commercially *valuable* information" that "itself yield[s] . . . commercial insight that is specific to the operations of the federal contractor." *Id.* at *4 (emphasis added). The court concluded that the Department had not raised a genuine issue as to whether the information in the EEO reports would reveal commercially significant insights about the bellwethers. *See id.* at *3–5. Finding that Exemption 4 does not exclude the EEO reports from FOIA's general disclosure mandate, the district court ordered the Department to produce the withheld reports. *See id.* at *8.

The Department appealed. We have jurisdiction to review the district court's order requiring the Department to produce the reports under 28 U.S.C. § 1292(a)(1). *See In re Steele*, 799 F.2d 461, 465 (9th Cir. 1986). We review the court's order de novo. *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 988 (9th Cir. 2016) (en banc) (per curiam). Under that standard, we "view the evidence in the light most favorable to the nonmoving party, determine whether there are any genuine issues of material fact, and decide whether the district court correctly applied the relevant substantive law." *Id.* at 989; *see also* Fed. R. Civ. P. 56.

## II. The bellwethers' EEO reports do not contain "commercial" information subject to Exemption 4.

FOIA requires that "each [federal] agency, upon any request for records . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). This disclosure mandate applies both to information created by the federal government and to records furnished to the government by private parties, like the EEO reports. *See FCC v. AT&T, Inc.*, 562 U.S. 397, 400–02 (2011). Congress enacted the statute to facilitate public access to government records and thereby "ensure an informed citizenry" that could hold the government "accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). To that end, FOIA authorizes parties to sue federal agencies that deny their requests for government records, as the Center did here. *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1193 (9th Cir. 2011). Congress recognized, however, that the government may legitimately keep some information from the public. *Id.* at 1194. So FOIA includes nine exemptions, under which agencies may withhold information that they would otherwise be required to disclose. *See* 5 U.S.C. § 552(b). "Mindful of FOIA's general command to provide 'broad disclosure,' we interpret its exemptions narrowly[.]" *Pomares v. Dep't of Veterans Affs.*, 113 F.4th 870, 881 (9th Cir. 2024) (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989)). The agency seeking to withhold the requested records "has the burden of showing that a claimed exemption applies[.]" *Id.*

The Department withheld more than sixteen thousand EEO reports responsive to the Center's requests because it determined that the workforce-composition information in the reports fell within Exemption 4. That exemption protects "commercial or financial information obtained from a

person and privileged or confidential." 5 U.S.C. § 552(b)(4). The Department argues only that the EEO reports contain "commercial," not "financial," information. The district court determined that none of the information in the reports is "commercial" under Exemption 4. *See Ctr. for Investigative Reporting*, 2023 WL 8879244, at \*3–5. Though our reasoning differs from the district court's, we agree that the Department failed to show that the reports contain any "commercial" information. We therefore need not address whether the other elements of Exemption 4 are satisfied.

### A. Information is "commercial" under Exemption 4 if it is an object of commerce or has the subject of commerce.

FOIA does not define "commercial," so we give the term its plain meaning. *Pomares*, 113 F.4th at 882. In *Pomares,* we held that "[i]nformation is 'commercial' if it pertains to 'business [or] trade,' or is designed to be profitable." *Id.* (second alteration in original) (first quoting *Commerce, Commercial*, *American Heritage Dictionary of the English Language* 267 (1969); and then citing *Commercial, Webster's Third New International Dictionary* 456 (1963)). Or as the Court of Appeals for the D.C. Circuit has put it, information is commercial if it "serves a 'commercial function' or is of a 'commercial nature.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1265 (D.C. Cir. 2023) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38–39 (D.C. Cir. 2002)). We thus have contemplated two ways for information to be "commercial" under Exemption 4: it is the object of commerce (designed to profitable), or it has the subject of commerce (pertaining to commerce). In both usages, commerce has its plain meaning of "the exchange of goods or services or the making

of a profit." *Pomares*, 113 F.4th at 882 (quoting *Citizens for Resp. & Ethics*, 58 F.4th at 1265).

First, information is the object of commerce—serves a commercial function—and is therefore "commercial" if it is designed to be profitable. *See id.* That is, if it was made to be bought and sold. *See Brown v. Perez*, 835 F.3d 1223, 1230–31 (10th Cir. 2016) (holding that information that an entity "ultimately sells as a product" was "commercial"). The Department does not argue that any of the information in the EEO reports was made to be bought and sold. *Cf. Norton*, 309 F.3d at 38–39 (explaining that research data was not "commercial" because the exchange of the data did "not constitute a commercial transaction in the ordinary sense" and its owner was "forbidden by statute to sell the . . . data").

Second, information has the subject of commerce—is of a commercial nature—and is therefore "commercial" if it pertains to business or trade. *Pomares*, 113 F.4th at 882. This includes "records that . . . 'actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories[.]'" *Citizens for Resp. & Ethics*, 58 F.4th at 1263 (quoting *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)); *see also* H.R. Rep. No. 89-1497, at 10 (1966). It also includes information that describes the goods and services being sold, *see, e.g.*, *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Hum. Servs.*, 901 F.3d 343, 347, 351 (D.C. Cir. 2018) ("number and types" of animals imported by a company); *Pub. Citizen*, 704 F.2d at 1290 ("documentation of the health and safety experience of . . . products"); their prices, *see, e.g.*, *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1111–12 (9th Cir. 1994) (dollar value of subcontracts), *overruled on other grounds by Animal Legal Def. Fund*, 836 F.3d at 988–89; *McDonnell Douglas*

*Corp. v. Nat'l Aeronautics & Space Admin.*, 180 F.3d 303, 306 (D.C. Cir. 1999) ("line item price information"); *N.H. Right to Life v. U.S. Dep't of Health & Hum. Servs.*, 778 F.3d 43, 50 (1st Cir. 2015) ("fees and collections policies"); customers' identities, *see, e.g.*, *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Rsrv. Sys.*, 463 F.3d 239, 242, 244 (2d Cir. 2006) (names of commercial customers); *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) ("customer lists"); the terms governing the exchange, *see, e.g.*, *Pomares*, 113 F.4th at 882 ("consulting agreements"); *Utah v. Dep't of Interior*, 256 F.3d 967, 968–71 (10th Cir. 2001) (lease terms); or other "intimate aspects of an [entity's] business such as supply chains and fluctuations of demand for merchandise," *Watkins*, 643 F.3d at 1195. And "commercial" information need not describe an existing transaction: it may instead forecast transactions and profits. *See, e.g.*, *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319–20 (D.C. Cir. 2006) (letters describing companies' "commercial strengths and weaknesses" and predicted effect of a trade dispute on future commercial activities).

The Department argues that the information in the EEO reports is "commercial" because it relates to commercial subject matter. This information, the Department argues, reflects a contractor's headcount and organizational structure, its resulting capacity to engage in commerce, its performance on diversifying its workforce, and its trends on these measures over time. So for the reports to qualify for Exemption 4, the Department must show that these types of information, similar to the types of information listed above, describe an "exchange of goods or services or the making of a profit." *Pomares*, 113 F.4th at 882 (quoting *Citizens for Resp. & Ethics*, 58 F.4th at 1265).

## B.  The information in the bellwethers' EEO reports is not commercial under Exemption 4.

The information in the bellwethers' EEO reports does not have a "commercial" subject within the meaning of Exemption 4. The workforce-composition data in the reports at issue do not describe "the exchange of goods or services or the making of a profit." *Pomares*, 113 F.4th at 882 (quoting *Citizens for Resp. & Ethics*, 58 F.4th at 1265). Instead, the reports describe only two types of information about federal contractors' workforces: (1) data on the number of employees in each of ten general job categories and (2) demographic data on the employees' race, sex, and ethnicity. They do not disclose any details about the services provided by federal contractors, the prices charged for those services, the resulting profits, the terms of the contractors' agreements with the government, or any similar information that we or other courts ordinarily treat as "commercial." So the EEO reports do not, without more, reveal anything about the exchange of goods or services. *Cf. Van Bourg, Allen, Weinberg & Roger v. NLRB*, 728 F.2d 1270, 1272–73 (9th Cir. 1984) (holding that information about a company's employees, detailing the names and home addresses of all who are eligible to vote in certain union elections, "cannot fairly be characterized as . . . 'commercial'" under Exemption 4 (quoting *Getman v. NLRB*, 450 F.2d 670, 673 (D.C. Cir. 1971))).

The Department argues that the job-category data in the EEO reports is nevertheless "commercial" because it still reveals some information related to contractors' exchanges of goods and services, albeit indirectly. The Department asserts that a contractor's overall and category-specific number of employees describes its "ability to produce or trade . . . goods or services[,]" and its "human-resources

strategy and decisions," both of which affect its profitability. Allied Universal, for example, primarily sells "guard hours," equivalent to one hour of security-guard time. So its "ability to supply its product—guard hours—is a direct function of the number of security guards it employs," which can be gleaned from its job-category data. Similarly, "[a]s a service contractor, NMR's primary offering is its workers' skills and expertise and how much work NMR can perform is a function of how many workers NMR employ[s]." And NorthShore, DHL, and Brandenburg each explained that their ratios of managers to service-workers influences the profitability of their services. Thus, the Department argues that the job-category data in the EEO reports enables inferences about each contractor's production capacity and profit margins. And, it contends, an annual series of EEO reports enables inferences about trends in those measures over time.

As the district court noted, however, the job-category data in the EEO reports does not *alone* reveal information about the contractors' profitability, volume of products, or other aspects of their commercial exchanges. Consider Allied Universal. While the number of security guards it employs influences the volume of services it can provide, other factors like its overhead costs also play a role. And the reports do not contain information on security guards' schedules, wages, or work locations, which also affect the number of guard hours that Allied Universal sells. For the other bellwethers, too, the job-category data in the EEO reports reveals only one of multiple factors that affect their sales and profits. So the Department has shown only an attenuated connection between the job-category data and the contractors' commercial activity. And aggregating such indirect data over multiple years does not make the

connection any more direct. "[T]he government may not rely on Exemption 4 where the withheld information only tenuously or indirectly concerns the exchange of goods or services or the making of a profit." *Citizens for Resp. & Ethics*, 58 F.4th at 1265.

The same goes for the EEO reports' data on the racial, sexual, and ethnic diversity of contractors' workforces. The Department argues that "[d]iverse firms are better able to attract and retain talented employees and compete for customers in certain markets." But in the record it drew only indirect connections between a diverse workforce and a contractor's exchange of goods or services. DHL, for example, declared that "[h]aving a diverse workforce is beneficial to [its] commercial success, as it enhances the diversity of thought and perspectives in the organization, helps boost innovation, and leads to the attraction, recruitment, and retention of more diverse employees in the future." NMR similarly stated that "increased diversity boosts innovation and ensures consideration of different perspectives," allowing the company "to be more responsive to customers" and to recruit applicants. And the Department's expert highlighted studies showing that "diversity is an organizational resource that translates into a competitive advantage for firms through a greater capacity for resource acquisition, market access, innovation and strategic flexibility." Because tracking diversity data helps companies to realize these benefits, the Department argues, the data is itself "commercial." Yet the Department again fails to explain how this data describes contractors' exchange of goods or services or their making of a profit, so the Department has not shown that it is "commercial."

The district court reached the same result for a different reason. It determined that the information in the EEO reports

was not "commercial" because it lacks commercial value, so its disclosure would not result in competitive harm to contractors. *See Ctr. for Investigative Reporting*, 2023 WL 8879244, at *4–5. But nothing in the text of Exemption 4 imposes any commercial-value or competitive-harm requirement. *Cf. Argus Leader*, 588 U.S. at 439 (rejecting argument that information is "confidential" under Exemption 4 only if its disclosure is likely to result in "substantial competitive harm"). Instead, whether information is "commercial" under Exemption 4 turns only on whether "'in and of itself' it serves a 'commercial function' or is of a 'commercial nature.'" *Norton*, 309 F.3d at 38 (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 U.S. F.2d 863, 870 (2d Cir. 1978)); *see also Pomares*, 113 F.4th at 882. "That disclosure might cause commercial repercussions" is neither necessary nor "suffic[ient] to show that information is 'commercial' under Exemption 4." *Citizens for Resp. & Ethics*, 58 F.4th at 1268; *cf. Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1129 (9th Cir. 2007) (rejecting argument that information is of "a commercial nature" under the Postal Service Act merely "because it has value"), *abrogated on other grounds by Animal Legal Def. Fund*, 836 F.3d at 988–89. Nor does it matter whether the contractor that created an EEO report is a for-profit company. *See N.H. Right to Life*, 778 F.3d at 50 ("The term 'commercial' as used in the statute modifies 'information' and not the entity supplying the information.").

## III.  Conclusion

The information in the bellwethers' EEO reports is not "commercial." So we affirm the district court's order concluding that the Department must disclose the reports on that basis alone. Because Exemption 4 does not apply to the EEO reports, we need not address the FOIA Improvement

Act, 5 U.S.C. § 552(a)(8)(A)(i), *see Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 235 (2d Cir. 2022), nor whether that Act incorporates the protections of the Trade Secrets Act, 18 U.S.C. § 1905.

   **AFFIRMED.**