# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 8, 2017          Decided August 17, 2018

No. 16-5269

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00309)

*John Seber* argued the cause and filed the briefs for appellant.

*Damon W. Taaffe*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

*Elizabeth R. Geise* was on the brief for *amicus curiae* American Anti-Vivisection Society in support of appellant.

Before: TATEL, GRIFFITH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, People for the Ethical Treatment of Animals (PETA) asked the Centers for Disease Control in the U.S. Department of Health and Human Services (collectively, HHS) for information about the importation of nonhuman primates. The importers objected that answering some of the requests would reveal confidential information about their businesses. HHS agreed and redacted certain types of information under one of FOIA's exemptions. The district court upheld the redactions, and we affirm.

I

A

On May 16, 2014, PETA submitted a FOIA request to HHS for information about the importation of nonhuman primates from May 1, 2013, until the request was processed. PETA asked for information collected under two agency regulations: The first requires importers to register with HHS and submit a statement describing "the number and types of [nonhuman primates] intended for import during the registration period" and "the intended permitted purposes for which the [nonhuman primates] will be imported." 42 C.F.R. § 71.53(g)(1)(i), (ii). The second requires importers to provide documentation that describes how many animals of which species are in each shipment, the size of their crates, the exporter shipping them, and the airline used. *Id.* § 71.53(n)(2). HHS collects this information as part of its effort "to prevent the transmission of communicable disease from nonhuman primates . . . imported into the United States, or their offspring, to humans." *Id.* § 71.53(a); *see* Public Health Service Act, 42 U.S.C. § 264.

HHS identified relevant information collected from ten importers and, as required by Executive Order No. 12600 and HHS regulations, notified them of the impending release. *See* Predisclosure Notification Procedures for Confidential Commercial Information, Exec. Order No. 12600, 52 Fed. Reg. 23,781 (June 23, 1987); 45 C.F.R. § 5.42. Each notification included the documents HHS was about to disclose from that importer, giving the importer an opportunity to explain whether any of the information should be withheld and to request redactions.

Seven importers[1] responded, objecting to the disclosure of various information and requesting redactions. Three importers[2] did not respond. HHS then released 1,575 pages of redacted documents.

B

Before HHS released the documents, PETA filed suit in district court after waiting the requisite period prescribed by FOIA. *See* 5 U.S.C. § 552(a)(6)(A), (C). Following the disclosure, the parties filed cross-motions for summary judgment. PETA claimed HHS had not fully answered the inquiry because the agency improperly withheld information that describes how many animals of which species were in each shipment, the size of their crates, the exporter shipping them, and the airline used. HHS argued those redactions were justified under FOIA Exemption 4, which protects

---

[1] Bartons West End Farms, Inc.; Buckshire Corporation; Charles River Laboratories; Covance Research Products, Inc.; PTLC/Primate Products, Inc.; Valley Biosystems; and Worldwide Primates, Inc.

[2] Central State Primates; Dallas Zoo Management; and SNBL USA.

"confidential" commercial information when disclosure would "cause substantial harm to the competitive position of the person from whom the information was obtained." *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 305 (D.C. Cir. 1999). HHS also provided supporting declarations from the FOIA Officer for the Centers for Disease Control and two of the importers, Worldwide Primates, Inc. (WWP), and Primate Products, Inc. (PPI).[3]

The district court granted partial summary judgment to both parties. It began by rejecting HHS's argument that information about the particular species being shipped was confidential. Although the importers had made that claim to HHS, they had not requested redactions of that information from many of the disclosed documents. As a result, those documents "contain[ed] extensive disclosures of the names of the animal species imported . . . during the twelve-month time period at issue." *PETA v. HHS* ("*PETA I*"), 201 F. Supp. 3d 26, 41 (D.D.C. 2016) (emphasis omitted). The district court also noted that the importers would often advertise publicly what species they were able to obtain. *Id.* The district court thus

---

[3] HHS filed declarations from WWP and PPI as representative of the objections to disclosure raised by the importers. HHS explained that certain other importers claimed their predisclosure responses to the agency contained information that was also subject to FOIA exemptions and should not be shared, although HHS offered to make the correspondence available for the district court to review *in camera*. The district court concluded such review was unnecessary at the summary judgment stage because HHS had already provided sufficient evidence to justify applying Exemption 4. *PETA v. HHS* ("*PETA I*"), 201 F. Supp. 3d 26, 38 n.10 (D.D.C. 2016). When the parties later moved for reconsideration of the district court's grant of summary judgment, the district court reviewed the correspondence and found that it provided further support for the court's decision. *PETA v. HHS* ("*PETA II*"), 226 F. Supp. 3d 39, 52-53 (D.D.C. 2017).

ordered HHS to release all information regarding the species shipped.

Next, as to the seven importers who objected to disclosure, the district court agreed with HHS that information about the number of animals shipped and their crate sizes would provide "valuable, detailed business data concerning each importer's capacity to import specific species and each importer's volume of business on a shipment-by-shipment basis." *Id.* at 42. The district court continued that "disclosure of the names of exporters and the names of airline carriers on a shipment-by-shipment basis . . . would enable competitors to gain an edge in this competitive market by obtaining valuable business data regarding the affected importer's 'supply chains, pattern of importation . . . and business relationships.'" *Id.* (emphasis omitted) (quoting *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1200 (9th Cir. 2011)). This information could also be used "to reverse-engineer the company's business model." *Id.* at 43 (quotation marks omitted). Accordingly, the district court held that HHS justifiably redacted this information.

But the district court reached a different conclusion regarding the three nonresponding importers. Although HHS had decided itself to redact their information to the same extent as the other importers, the district court explained there was a "reasonable assumption" that silence meant disclosure would not cause the nonresponding importers substantial competitive harm. *Id.* at 44-45. The district court ordered HHS to disclose their information.

C

After the district court entered judgment, the three nonresponding importers contacted HHS to explain they never

received notice that their information might be released. They provided declarations to HHS, later filed with the district court, alleging they would be harmed by the disclosure just like the other importers. HHS moved under Federal Rule of Civil Procedure 60(b)(6) for reconsideration of the judgment regarding these three importers, which the district court granted because it had mistakenly assumed their silence was intentional. *PETA v. HHS* ("*PETA II*"), 226 F. Supp. 3d 39, 50 (D.D.C. 2017). The district court held that HHS could lawfully redact information for these importers as well.

On appeal, PETA argues that information about the number of nonhuman primates in each shipment, the size of their crates, and the airline carrier used is not confidential, and that the district court erred when granting relief to HHS under Rule 60(b)(6).

II

The district court had subject-matter jurisdiction under 5 U.S.C. § 552(a)(4)(B). We have appellate jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment. *Multi Ag. Media LLC v. USDA*, 515 F.3d 1224, 1227 (D.C. Cir. 2008). We review its Rule 60(b)(6) determination for abuse of discretion. *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988).

III

FOIA "requires federal agencies to disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 366 (D.C. Cir. 2008); *see Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011). "The strong presumption in favor of disclosure places the burden on the

agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). HHS can meet this burden through affidavits or declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). PETA concedes that the requested information is "commercial" in nature and "obtained from a person," and HHS does not argue the information is privileged. The only question on appeal is whether the requested quantity, crate size, and airline carrier information is "confidential."

When, as here, a statute or regulation requires a person to submit information to the government, we determine whether that information is confidential for purposes of Exemption 4 using the two-part test from *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 880 (D.C. Cir. 1992) (en banc). Such information is confidential only if disclosure would either "impair the [g]overnment's ability to obtain necessary information in the future" or "cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks*, 498 F.2d at 770; *see also McDonnell Douglas*, 180 F.3d at 304-05; *Critical Mass*, 975 F.2d at 878-80.

HHS argues that disclosure of shipment-by-shipment quantity, crate size, and airline carrier information would cause substantial harm to the competitive position of the importers. This requires HHS to provide "both a showing of actual competition and a likelihood of substantial competitive injury." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C. Cir. 1987); *see Pub. Citizen Health Research Grp. v. FDA* ("*Pub. Citizen I*"), 704 F.2d 1280, 1291 (D.C. Cir. 1983); *Nat'l Parks*, 547 F.2d at 679. "[A] sophisticated economic analysis of the likely effects of disclosure" is unnecessary. *Pub. Citizen I*, 704 F.2d at 1291.

IV

A

At the summary judgment stage, PETA conceded that the market for nonhuman primates is competitive and thus waived its contrary argument on appeal. *See PETA II*, 226 F. Supp. 3d at 56 n.7; *PETA I*, 201 F. Supp. 3d at 37; Plaintiff Opp. and Cross Mot. at 11, *PETA I*, 201 F. Supp. 3d 26, ECF No. 23-1 ("PETA does not challenge the existence of competition, so the critical issue is whether substantial competitive injury would likely result from disclosure."). In any event, HHS established that the domestic market has a limited number of licensed importers who compete against each other and similar international businesses for a limited number of suppliers, airline carrier services, and clients interested in nonhuman primates. *See* Declaration of Ira M. Block, Chief Executive Officer of WWP ("Block Decl.") ¶ 5, *PETA I*, 201 F. Supp. 3d 26, ECF No. 28-2, J.A. 110; Declaration of Thomas J. Rowell, President and Chief Operating Officer of PPI ("Rowell Decl.") ¶ 6, *PETA I*, 201 F. Supp. 3d 26, ECF No. 28-3, J.A. 114. We would have little difficulty concluding the market for importing

nonhuman primates is competitive even without PETA's waiver.

B

Competition among the importers turns in part on their ability to obtain nonhuman primates at low cost and in large enough quantities to meet the demands of their clients. *See Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981) ("[C]ompetition in business turns on the relative costs and opportunities faced by members of the same industry . . . ."). In other words, the supply chain, importation pattern and capacity, and business relationships of each importer are integral to its commercial success. *See* Declaration of Katherine S. Norris, FOIA Officer for the Centers for Disease Control ("Norris Decl.") ¶ 29, *PETA I*, 201 F. Supp. 3d 26, ECF No. 17-1, J.A. 19. Courts routinely hold that disclosing this type of information presents a likelihood of substantial competitive injury that warrants protection under Exemption 4.

For example, in *Trans-Pacific Policing Agreement v. U.S. Customs Service*, 177 F.3d 1022, 1026 (D.C. Cir. 1999), we held that disclosing information about the "nature, cost, profit margin, and origin" of certain shipments would likely cause substantial competitive injury to the importers in that case. We explained that this information would allow competitors to "gain a picture of an importer's intentions, profit margin, and other plans." *Id.* (quotation marks omitted). Likewise, in *Watkins v. U.S. Bureau of Customs & Border Protection*, the Ninth Circuit applied the *National Parks* test and held that disclosing "intimate aspects of an importer[']s business such as supply chains and fluctuations of demand for merchandise," including the quantity of merchandise in particular shipments, presented a sufficient likelihood of substantial competitive

injury under Exemption 4. *Watkins*, 643 F.3d at 1195. And in *Gilda Industries, Inc. v. U.S. Customs & Border Protection Bureau*, 457 F. Supp. 2d 6, 11 (D.D.C. 2006), the district court agreed with an agency that "pairing specific importers with the precise products that they import during a particular three-month period would be valuable to a competitor hoping to gain an edge in the relevant market." The district court credited statements by the importers that disclosing "valuable business data such as sources of supply, product lines, supply chains and customers" would "enable a competitor to target those suppliers who are of most benefit to the company by offering slightly higher prices or otherwise disrupting supply chains abroad." *Id.* (quotation and alteration marks omitted); *see Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, 588 F. Supp. 2d 51, 55-58 (D.D.C. 2008) (similar). The shipment-by-shipment information in this case is no different.

Because "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt," we discuss animal quantity, crate size, and airline carrier information in turn. 5 U.S.C. § 552(b); *see also Trans-Pac. Policing Agreement*, 177 F.3d at 1026-27; *see Pub. Citizen Health Research Grp. v. FDA* ("*Pub. Citizen II*"), 185 F.3d 898, 906-07 (D.C. Cir. 1999).

1

HHS determined that disclosing shipment-by-shipment quantity information would harm each importer by revealing its importation pattern and capacity to obtain nonhuman primates. We agree that disclosing this information would likely cause substantial competitive injury.

As WWP explained, revealing the number of each species of animal in its shipments would "allow [its] competition to

determine [its] volume of business and possibly interfere with [its] supply of such species." Block Decl. ¶ 10, J.A. 111; *see id.* ¶ 5, J.A. 110 (explaining that quantity information "could allow competitors to learn a company's capacity to obtain, house and transport" nonhuman primates). PPI added that competitors with the ability to import larger numbers of certain nonhuman primates could leverage and "promote this fact to [buyers] and claim that they had a greater capacity to provide this species," thereby gaining a competitive advantage in negotiations. Rowell Decl. ¶ 6, J.A. 114. The importers operate in a limited market where "even relatively small increases or decreases in the success of a particular importer can have an outsized impact [on] competitors." *Id.*

Shipment-by-shipment quantity information would also reveal the percentage of business by volume each importer devotes to a particular species. Block Decl. ¶ 10, J.A. 111. If a competitor knew that a large percentage of another importer's business was from a particular species of nonhuman primate, the competitor might try to drive up the other importer's costs or cut off its supply by offering higher prices to purchase that species from exporters. *Id.*; *see Gilda Indus.*, 457 F. Supp. 2d at 10-11. The competitor might also choose to sell that species at a lower price to reduce the profits of the other importer and drive it from the market. Block Decl. ¶ 5, J.A. 110; Rowell Decl. ¶ 6, J.A. 114. Or a competitor might use importation patterns to predict and counter another importer's business plans, such as an intent to expand or contract its presence in a particular sector of the market. *See Watkins*, 643 F.3d at 1195; *Trans-Pac. Policing Agreement*, 177 F.3d at 1026.

PETA responds that the U.S. Department of Agriculture (USDA) "already posts detailed inventories of the exact number of species and quantities that each importer possesses."

PETA Br. 27. If these inventory snapshots are already public, PETA reasons, disclosure cannot cause competitive injury.

PETA is correct that information already available to the public cannot cause competitive injury and is not protected from disclosure by Exemption 4. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) ("[I]f identical information is truly public, then enforcement of an exemption cannot fulfill its purposes."); *CNA Fin. Corp.*, 830 F.2d at 1154 ("To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4."). That said, to prevail on this argument, the requesting party "has the burden of showing that there is a permanent public record of the *exact portions* he wishes" to obtain. *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (emphasis added). That is where PETA's argument fails.

We see a material difference between inventory snapshots, posted periodically as part of inspection reports by the USDA, and the number of nonhuman primates obtained in various shipments. While an inventory snapshot might reveal the ability of an importer to satisfy the immediate market demand for nonhuman primates at the time of the inspection, it says nothing about the ability of each importer to obtain additional nonhuman primates and meet long-term or increased demand. Nor does it say anything about the importer's inventory the day before or after the inspection. Shipment-by-shipment quantity information is a far more accurate measure of business volume than the inventory each importer has at given points in time, which are often many months apart. The inventory snapshots of a particular importer might remain steady over multiple years regardless of whether that importer obtained 50 or 5,000 nonhuman primates for its clients between inspections.

Moving on, PETA points out that the two importers who provided declarations, WWP and PPI, did not request specific redactions of quantity information from the majority of their documents despite saying such information was confidential. PETA views this as a tacit admission that disclosing quantity information will not cause these or any other importers substantial competitive injury. Moreover, PETA argues, the omission undermines the validity of their declarations.

Whether WWP and PPI failed to request specific redactions of their quantity information out of inadvertence or a subjective belief that their particular information would not cause substantial competitive injury does not negate that such information is objectively confidential. Indeed, those two importers could have requested the redactions and HHS would have been justified in withholding their quantity information. Their failure to do so does not prevent HHS, the district court, or us from finding their reasoning persuasive, nor does it compromise the confidentiality interests of the other importers, all of whom objected to release of the same information and requested specific redactions. *See Pub. Citizen Health Research Grp. v. Nat'l Insts. of Health*, 209 F. Supp. 2d 37, 50 (D.D.C. 2002) ("The evidence of those who did respond was overwhelmingly against disclosure which tips the scales heavily toward a conclusion that release of the information would likely cause substantial competitive injury."). HHS was therefore justified in withholding shipment-by-shipment quantity information, and summary judgment was appropriate on this issue.[4]

---

[4] In ruling on another motion, the district court actually ordered HHS to disclose the number of animals in each shipment, along with their crate sizes, for WWP and PPI because those two importers failed to request redactions for much of that information. HHS does not appeal that decision.

2

HHS next argues that crate sizes are tantamount to quantity information and therefore confidential. This is so because "the size and dimension of crates . . . reveal[] the capacity of the crates and can provide insight into the size or type of [nonhuman primate] imported." Rowell Decl. ¶ 6 & n.1, J.A. 114 & n.1. PETA disputes this assertion, arguing that crates come in all shapes and sizes and can hold any number or type of nonhuman primates. Therefore, PETA reasons, crate sizes cannot be used to estimate the number or type of imported nonhuman primates.

Even a cursory review of the importation documents reveals that crate sizes indicate corresponding quantity information. Certain size crates are routinely used to transport certain numbers of nonhuman primates. In fact, many of the sizes actually include the number of individual compartments or quantity of nonhuman primates each can accommodate, and we have no indication that shipments contain empty crates. PETA's insistence that crate sizes do not reveal the number of nonhuman primates in each shipment is unconvincing.

PETA otherwise repeats the same objections it raised regarding quantity information, but we are persuaded that HHS was justified in withholding crate sizes for the same reasons it could redact quantity information over those objections. Summary judgment was therefore appropriate on this issue and we need not consider whether crate sizes also reveal individual details about the nonhuman primates inside.

3

Finally, HHS explains that airline carriers willing to transport nonhuman primates are scarce and constitute another

integral aspect of each importer's supply chain. WWP asserts that "the ability to locate airlines willing to transport research animals [is] the single most time consuming aspect of the logistical portion of this business which also consumes an extensive amount of effort and expense." Block Decl. ¶ 7, J.A. 110; *see* Rowell Decl. ¶ 7, J.A. 114 ("[M]uch time, expense and effort is involved in locating airlines."). And "when a viable transport route is able to be established, [nonhuman primate importers] seek to guard this information vigorously." Block Decl. ¶ 7, J.A. 110. Airline carriers also "signal to . . . competition the country from where the import is being received, thereby giving [competitors] valuable trade information regarding species that are available, supplier names, and means or methods of transport." Rowell Decl. ¶ 8, J.A. 115; *see* Norris Decl. ¶ 29, J.A. 19.

A competitor could easily use this information to target and disrupt, whether by outbidding or other means, a specific supply chain in an effort to drive an importer from the market or steal importation capacity. *See Gilda Indus.*, 457 F. Supp. 2d at 11. New companies as well would be able to enter the market without the startup costs associated with researching successful importation means and practices. *See Pub. Citizen II*, 185 F.3d at 905. Disclosing this information would provide competitors with something of a free roadmap to the industry—a "potential windfall" that "could easily have competitive consequences." *Worthington Compressors*, 662 F.2d at 51.

PETA argues that airlines willing to carry nonhuman primates are commonly known and so disclosing their identities would not cause substantial competitive injury. But, as the district court properly noted, PETA overlooks the essential distinction between general industry data and particular business relationships or shipment-by-shipment supply chain information. *PETA I*, 201 F. Supp. 3d at 42-43;

*see Davis*, 968 F.2d at 1280. Knowing in the abstract which airlines transport nonhuman primates is very different than knowing which importers have relationships with which airline carriers, and which airline carriers are willing to transport which species of nonhuman primate along which routes and from which countries. Summary judgment was appropriate on this issue as well.

\* \* \*

We conclude this discussion by noting that the likelihood of substantial competitive injury can increase disproportionately as more information is released. Requiring disclosure of multiple types of information provides a more comprehensive picture of each importer's supply chains, importation patterns and capacity, and business relationships. As the district court observed, "[T]he record evidence . . . indicates that [nonhuman primate] importers have taken considerable efforts to develop and protect business models effectuating the cost-effective transport of nonhuman primates into the United States through strategic relationships with exporters and airlines." *PETA I*, 201 F. Supp. 3d at 42; *see also* Block Decl. ¶ 9, J.A. 111. The number of nonhuman primates in each shipment, the size of their crates, and the airline carriers used would give competitors key data on how to disrupt, compete with, or copy those business models.

Because the market for nonhuman primates is competitive and disclosure would likely cause substantial competitive injury, releasing shipment-by-shipment quantity, crate size, and airline carrier information would cause substantial harm to the competitive position of each importer. The information is therefore confidential and protected from disclosure by Exemption 4.

V

We now turn to the district court's decision to grant HHS's Rule 60(b)(6) motion. In considering a Rule 60(b) motion, the district court "must strike a 'delicate balance between the sanctity of final judgments . . . and the incessant command of a court's conscience that justice be done in light of *all* the facts.'" *Twelve John Does*, 841 F.2d at 1138 (quoting *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980)). This relief "should be only sparingly used," *Good Luck*, 636 F.2d at 577, and reserved for "extraordinary circumstances," *Ackermann v. United States*, 340 U.S. 193, 199 (1950). It should not "be employed simply to rescue a litigant from strategic choices that later turn out to be improvident. And a party that has stipulated to certain facts or has not presented known facts helpful to its cause when it had the chance cannot ordinarily avail itself on [R]ule 60(b) after an adverse judgment has been handed down." *Good Luck*, 636 F.2d at 577 (citations omitted); *see Twelve John Does*, 841 F.2d at 1140-42 (discussing the Rule 60(b)(6) standard).

We have held that "[w]hen a party timely presents a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust, reconsideration under [R]ule 60(b)(6) is proper." *Good Luck*, 636 F.2d at 577. In FOIA cases, relief under Rule 60(b)(6) is all the more appropriate when "it involves not only the interests of the [agency], but that of a third party whose . . . information [is] expressly protected by FOIA." *Comput. Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir.), *amended* (Feb. 20, 1996); *see Delta Ltd. v. U.S. Customs & Border Prot. Bureau*, 393 F. Supp. 2d 15, 17 (D.D.C. 2005) ("[I]t seems clear that injury to innocent third parties [from a FOIA disclosure] would fall beneath the 'manifest injustice' umbrella."); *Changzhou Laosan Grp. v. U.S. Customs &*

*Border Prot. Bureau*, 374 F. Supp. 2d 129, 131-32 (D.D.C. 2005) (similar).

The district court granted the Rule 60(b)(6) motion because it had assumed that silence on behalf of the nonresponding importers indicated they did not object to disclosure of their information. The district court did not reconsider whether the various types of information were confidential, but instead whether the nonresponding importers somehow conceded that disclosing their particular information was harmless. In addition, the district court explained that HHS's failure to timely present this evidence was not due to neglect, and the prejudice that would otherwise result to the third-party importers was "inherently unfair" and weighed in favor of reconsideration. *PETA II*, 226 F. Supp. 3d at 47.

We are mindful that "the district judge, who is in the best position to discern and assess all the facts, is vested with a large measure of discretion in deciding whether to grant a Rule 60(b) motion." *Twelve John Does*, 841 F.2d at 1138. We see no abuse of that discretion here. And given that we have granted relief under Rule 60(b)(6) to protect third parties when an agency had "not presented *known* facts helpful to its cause when it had the chance," *Comput. Prof'ls*, 72 F.3d at 903 (emphasis added), we see even more reason to uphold the district court's discretion where HHS presented previously *unknown* facts.

PETA argues that Exemption 4 is an objective inquiry that should not turn on subjective assertions of competitive harm by the importers. *See Nat'l Parks*, 498 F.2d at 766 ("[T]he test for confidentiality is an objective one."). In other words, information is not confidential just because the importers say so. But this argument overlooks that the district court had already determined that shipment-by-shipment quantity, crate size, and airline carrier information were objectively

confidential in this case. When the district court realized it was mistaken to assume that silence meant disclosure would be harmless for the nonresponding importers in particular, the district court simply applied its objective conclusion that such information was confidential. The district court did not allow HHS to withhold anything just because the importers claimed it was confidential.

In response to the Rule 60(b)(6) motion, PETA produced new evidence to refute or undermine the alleged likelihood of substantial competitive injury that each of the nonresponding importers would experience from disclosure of the relevant information. The district court refused to consider this evidence because PETA failed to timely submit it for consideration during the summary judgment proceeding. This was not an abuse of discretion, either. *See Good Luck*, 636 F.2d at 577. PETA was impermissibly "seek[ing] to re-litigate the merits of the Court's underlying decisions with regard to the applicability of Exemption 4." *PETA II*, 226 F. Supp. 3d at 50.

Moreover, PETA now tries to raise additional arguments it did not make in connection with the Rule 60(b)(6) motion below. Those arguments were forfeited. *Keepseagle v. Perdue*, 856 F.3d 1039, 1053-54 (D.C. Cir. 2017).

## VI

We affirm the judgment of the district court.

*So ordered.*